JAMES L. ALCORN, Levee Commissioner, v. CHARLES F. HAMER.

SAME v. ALBERT P. HILL.

1. CONSTITUTIONAL LAW: LEGISLATIVE POWER, WHERE VESTED, AND HOW EXERCISED.—The whole legislative power of the people of this State is vested by the Constitution in the Senate and House of Representatives; and no part of

it can be delegated by the legislature to the whole, or any portion of the people, or to any other department of the government; nor can the Senate and House of Representatives associate with themselves, in the exercise of legislative functions, any person, power, or tribunal whatever.

2. SAME: SUBMISSION OF LAWS TO THE VOTE OF THE PEOPLE.—An act, which is a mere legislative preparation, plan, or project of a law, and which is to be submitted to the people for their adoption or rejection, is unconstitutional and void; but when the act is complete in itself,—having received its final sanction from the legislative will, and which, by its express terms, goes into effect as a law, it is a valid exercise of legislative power, although the execution of some of its provisions is made to depend upon the result of the vote of the people of the district or county, who are affected by it.

3. SAME: SAME.—The power to enact laws necessarily includes the right in the law-making power to determine and to prescribe the conditions upon which the law, in a given case, shall come into operation, or be defeated; and this contingency may as well be the result of the popular vote of the people of the locality to be affected by the law, as any other.

4. SAME: SAME.—The right of the legislature to prescribe the result of a popular vote of a district, as the contingency upon which a law shall go into operation or be defeated, being founded on and derived from the grant of legislative power made to that department in the Constitution, it necessarily follows, that the legislature is not restricted in the selection of the district for this purpose, to the political subdivisions of the territory of the State, previously established by the Constitution and laws.

5. SAME: TAXATION: RIGHT OF LEGISLATURE TO IMPOSE LOCAL TAXATION.—The legislature has the right, for local purposes, to impose local taxation upon any district or extent of territory less than the whole State, whether the people to be affected by it are citizens of the same county, or members of the same corporation, or residents of the same political division or district of the State, or not.

6. SAME: INTERNAL IMPROVEMENT LAWS: WHAT ARE.—The 7th Section of the 8th Article of the Constitution of this State, which declares that "no money from the treasury shall be appropriated to objects of internal improvement, unless a bill for that purpose be approved by two-thirds of both branches of the legislature," &c., applies exclusively to the public money of the State, which, by law, is to be deposited in, and disbursed from, the State treasury, located at the seat of government.

7. SAME: SAME: LOCAL TAXATION.—It is no valid objection to a law imposing taxes upon a district for the erection and repair of a public improvement situated in it, that a part of the taxes to be derived from a portion of the district is directed to be applied to the payment of debts which had been previously contracted by the municipal authorities of that portion of the district, towards the accomplishment of the improvement authorized by the law.

8. SAME: LEVEE.—The act, entitled "An Act to aid in repairing and perfecting the levee of the Mississippi river in the counties of De Soto, Tunica, Coahoma,

Bolivar, Washington, and Issaquena," approved 2d December, 1858, is constitutional.

APPEAL from the Chancery Court of Yazoo county. Hon. E. G. Henry, chancellor.

A very full statement of the case will be found in the opinion of the court, and the argument of counsel for appellees.

*Yerger & Anderson* and *Yerger & Rucks*, for appellants.

The record in this case presents the question of the constitutionality of the act of the legislature, passed on the 2d December, 1858, commonly known as the Levee Law.

The first objection which we shall notice is based upon the assumption that the act was not passed and did not become law by the will of the legislature.   The bill alleges that by the proviso to the first section " the act did not become a law until the same should be first submitted to the legal voters of the district of country proposed to be taxed," and this is claimed to be an authorized delegation of legislative power to a " body of law-makers unknown to the Constitution."

We maintain that there is no such unauthorized delegation of legislative power in the act, since its provisions are not susceptible of the construction placed upon them in the bill of complaint.

It is entitled " An act to aid in repairing and perfecting the levee of the Mississippi river," in certain counties mentioned, and proceeds to establish the system to be adopted, and applies it to a certain defined portion of territory as a district for the purpose.   It is an act complete and perfect in itself, and expresses fully and without reserve the legislative will, commanding what is to be done and the mode of doing it, except so far as its execution is left in the hands of inferior agents.

By the first section, a uniform tax of ten cents per acre, per annum, is levied and assessed on each and every acre of land lying within the district established, and the other sections contain full and ample directions as to the mode in which the fund thus created is to be collected, controlled, kept, managed, and expended for the benefit of the district, under a Board of Levee Commissioners, cre-

ated for the purpose. The act also by the last section takes effect and is in force from and after its passage. The objection, however, is founded on a proviso to the first section, which we will quote. It is as follows: "Provided, however, that the said tax proposed to be levied and collected in the said counties of De Soto, Tunica, Coahoma, Bolivar, Washington, Issaquena, Yazoo, Sunflower, Tallahatchie, and Panola, shall first be submitted to the legal voters in the district of country proposed to be taxed, on the first Monday in January, 1859, which said election shall be conducted in the same manner and upon the same notice as other elections, and if a majority of the legal voters residing in the district of country proposed to be taxed, vote against the said tax, then the same shall not be levied or collected." By the 29th section, it was provided "that the Governor of the State, as soon as the bill passed and became a law, should issue his proclamation to the sheriffs of the counties in which the lands taxed in this act are situated, to hold an election as provided for in the first section, and the question voted for shall be 'tax or no tax,' and on failure of an election being held in any of the counties, then the votes given in the counties in which elections may be held shall be taken as the sense of the legal voters of the district embraced in this act as provided in said first section."

In what sense, we ask, is this a delegation of legislative power? Does the law derive its authority as a rule of action from the vote of the people or from the legislative will which enacted it? We think most clearly from the latter. True, the execution of a certain provision of the law is made to depend on a vote of the people of the district; but this is a very different thing from transferring to the people the right to pass or not to pass a law on any given subject. The law is complete in itself, containing an entire and perfect declaration of the legislative will, and requiring nothing to perfect it as a rule of action, while it is only left to the body of the people to be affected by it, whether they will accept the benefit of its provisions and carry it into execution.

It does not delegate legislative power to the people, nor does it depend for its enactment as a law upon the exercise by them of any such power.

The authorities on this point are, we think, conclusive. The

principle on which they depend and to which we invite attention, is this : that the legislature may pass a law which may or may not take effect or go into operation upon a contingency provided in the law itself, and that contingency may be a vote of a portion of the people to be affected by the law in cases of local legislation ; or even a vote of the whole people, when the law is more general in its operation, and may affect the whole body of the people, there being no inherent vice in the nature of such a condition which shall serve to defeat the act when it would be legal and effectual if made to depend on any other condition.

In *Aurora* v. *The United States*, 7 Cranch, 382, the power to pass laws to go into effect upon a prescribed condition was established. The non-intercourse law previously enacted by Congress, had expired by limitation, when an act was passed to revive and put it into operation, on the condition that the governments of France and England did not within a certain time repeal certain obnoxious measures adopted by them in violation of our neutrality, and the President was clothed with the power to ascertain whether the said measures were repealed, and to make proclamation of the fact, when the law in question was to be revived and go into operation, otherwise it was not. The proclamation was made by the President in pursuance of the provision, and it was held that the legislation was valid, and the law took effect from the time prescribed.

It would be a needless waste of time to refer the court to the various instances of this species of legislation, furnished both by our State and national history.

The power to enact laws dependent on some prescribed contingency for their operation and effect, has never been doubted; the only question has been, whether a vote of the people, or a portion of them, might be prescribed as the condition on which the effect and operation of legislative enactments might be made to depend; and that it can be so done, is established by a vast preponderance of authority, if indeed there has been any dissent from the proposition.

In New York, the question has been frequently before the courts, and is finally settled in favor of such laws.

The first case we shall notice is that of *Barto* v. *Himrod*, 4 Sel-

den, 486, as it may be relied on as authority against us.   The question arose upon the constitutionality of the New York free school law of 1849, which was submitted to a vote of the people of the State, in the following terms, by the 10th section : " The electors shall determine by ballot, at the annual election, to be held in November next, whether this act shall or not become a law."

The 14th section provided, " That in case a majority of all the votes of the State shall be cast against the law, then this act shall become null and void; and in case a majority of all the votes of the State shall be cast for the new school law, then this act shall become a law, and shall take effect."

This law was held unconstitutional, upon the distinct ground " that it did not on its face, as it came from the hands of the legislature, purport to be a law for any other purpose than to submit to the people the question, whether its provisions should or should not become a law ?"   But the position which we maintain was distinctly and clearly admitted by the court, and it was not denied that a law might be passed, to take effect upon the contingency of a vote of the people; but the court said that such a statute, when it comes from the hands of the legislature, must be a law *in presenti*, to take effect *in futuro.*

In *Johnson* v. *Rich*, 9 Barb. Rep. 680, the Supreme Court of New York held the same enactment to be valid; while in the two cases, *Thorn* v. *Cramer*, 15 Barb. Rep. 112, and *Bradley* v. *Baxter*, Ib. 122, it was held to be unconstitutional, on the same ground taken in the case of *Barto* v. *Himrod.*   But in subsequent cases, both in the Supreme Court and in the Court of Appeals of New York, the authority of the case of *Barto* v. *Himrod*, was limited to the only point decided in it, viz., that where a mere proposition to pass a law is submitted to the people to decide, whether it shall be a law or not, it is unconstitutional, while it was uniformly held, especially in cases of local legislation, that an act which comes complete from the hands of the legislature, may nevertheless depend for its operation and effect upon the contingency of a vote of the people.

In *Corning* v. *Green*, 23 Barb. 35, decided in 1856, the question arose on the validity of an act providing for the construction of a basin in the city of Albany, at the termination of the Erie and

Champlain Canals. The 12th section provided that it should be void, unless the corporation of Albany filed their assent to it in sixty days. The act was not for the benefit of the city, but of certain lot proprietors. The statute was held valid, and not a delegation of legislative power. The court, in this case, reviews the decisions in 15 Barbour, 4 Selden, and the cases in 6 Barr, Penn. Rep., and 4 Harrington Rep., to be hereafter noticed, and maintains the only true principle, that while the general law-making power (that is, legislative power in its proper sense) cannot be delegated, nevertheless laws may be passed, whose operation shall depend on the consent of those to be affected by them.

In *Grant* v. *Courter*, 24 Barb. 238, decided in 1857, it was held that a power delegated to towns and corporations to borrow money and become stockholders in railroads, and impose taxes for the payment of the subscription, on the written consent of two-thirds of the tax-payers being obtained, was valid, and that the requirement of the assent of two-thirds of the tax-payers even as a condition precedent, did not affect the validity of the act; because, as a legislative act, it was complete whether the people of the towns chose to avail themselves of it or not. It was a grant of power which the people might by the assent of two-thirds accept or not; and for the further reason that the condition or restraint was itself imposed by the legislature, and was as much the unaided annunciation of its will as the conferring of the power.

Again, in *Clark* v. *The City of Rochester*, 24 Barb. 447, decided by the Supreme Court in the same year, an act of the legislature authorized the city of Rochester to make a loan of $300,000, and invest the same in the stock of the Rochester and Genesee Valley Railroad; but there was a provision that the law which authorized this should not take effect until they should be submitted to the electors of Rochester, for the purpose of determining whether or not it was expedient to borrow the money for the purposes prescribed. It was held that this case did not fall within the principle of *Barto* v. *Himrod*, 4 Selden, 483. That the submission to the vote was not a delegation of power to pass the law, but a fit and proper limitation and restraint upon the power granted, and entirely within the limits of legislative discretion.

It was also held that the act was complete and perfect when

passed.   It had all the attributes of a law, and was final and con-
clusive in all its parts.   Its final section declared (as in this case),
that the act should take effect from its passage, and this circum-
stance was strongly relied upon by the court.   Such conditional
legislation, say the court, had been universal, and to say that it
conferred legislative power was a sheer confounding of all distinc-
tions.   But this question came before the court of last resort in
New York.   The Court of Appeals, in the case of the *Bank of
Rome* v. *The Village of Rome*, in 18 New York (4 Smith's) Rep.
38, decided in 1858.   By an Act of 1853, the village of Rome was
authorized to subscribe for stock in a railroad terminating in the
village, and to impose a tax to raise money for taking the stock.
There was a provision that the trustees appointed for the purpose
should have no power to make the subscription or impose the tax
until it (the statute) was approved by two-thirds of the electors;
and that if the act should be so approved, the trustees were re-
quired to proceed to make the subscription.   It was also further
provided, as in this case, that the act should take effect from its
passage.

The court held the law to be valid, distinguishing it from the
case of *Barto* v. *Himrod*, in the following particulars : that in that
case the act related to the people of the whole State, and it was
submitted to the whole people whether it should become a law.
They who represented the whole people undertook to refer back to
the body they represented, the question how, in the particular case,
the duty of legislation should be exercised.   The event on which
that act was made to depend was nothing else than the vote of the
people on the identical question which the Constitution makes it the
duty of the legislature to decide.   The court proceeds to remark
that the case under discussion differed from the case of *Barto* v.
*Himrod* on the point on which that case turned.   The matter in-
volved here is one of local interest only.   The law here was to
take effect immediately, but the trustees were not to have power
to act under it until the law should be affirmed by the electors.   The
case is, therefore, in substance nothing but a submission to a vote
of the parties interested in the question, whether or not they chose,
that the municipal corporation should subscribe ; in other words,
the legislature did not compel the villagers to subscribe, but creat-

ing by law the necessary machinery, left it to the tax-payers to determine that matter.

We think these cases leave no doubt as to the position of the courts of New York on the question, and establish clearly the validity of such legislation both on principle and authority.

In Pennsylvania the rule is the same. It is true that in that State, in the case of *Parker v. The Commonwealth*, 6 Barr, 507, a law leaving it to the vote of the people of the several counties annually to say whether license to retail liquors should be granted was held unconstitutional, but this case, as will be seen, stands on grounds independent of the one under discussion. In that case there was a law already in existence authorizing the issuance of licenses, and the court held that the act in question was nothing more than a submission to the people of the question, in each county, whether they would repeal the old law and establish a new one in its place, which was clearly a legislative function; and the ground taken was that it was not an act of the legislature complete and perfect in itself, but depending on the vote of the people for its operation or execution, but a mere project prepared by the legislature of a law to be submitted to the people, whose votes were to determine its future existence or continued nonentity. The court, however, admits that a law may be passed on a contingency, and that contingency may be a vote of the people; the difference, however, it maintains is in conferring on the people a general legislative power to pass a law in reference to any particular subject. The distinction, in the opinion of the court, between a conditional law (referring to laws dependent on the contingency of a vote), and an act of the law-making power seeking to transfer its functions to another is, that the one leaves nothing to be done to perfect the rule of action; the other but models the clay into shape, leaving to third persons the task of breathing into its mimic shape the energy of life. In the one case the decree is, that this statute shall take effect in action or its operation be suspended on the happening of a particular event. In the other, " this act shall remain inoperative unless otherwise willed by the people." In the one case the law remains quiescent until the happening of the appropriate event stirs it into motion; in the other the so-called law is altogether without the power of motion of itself when it leaves the hand of the legislature.

In this case it is evident then that the principle on which the court acted was, that legislation of this kind is only void when the broad proposition alone is submitted to the people whether the act proposed shall be a law.    Whether the court was right in its application of the principle to the case before it, we need not inquire. What we seek from the case was the principle on which it was decided.    We are inclined to think that its application in the case was wrong.    That we are right in our view of the principle decided, is demonstrated by the view which the court took of the school laws in Pennsylvania.    They were identical in substance with the levee law.    They expressly provided that elections should be held in each school district, in which the vote should be " school or no school," and if the vote was for schools, the directors were to proceed to establish schools, and a tax was to be imposed for the purpose, but otherwise, if the vote was against the schools.    The court held these laws to be constitutional, and referring to them, says : " They came from the General Assembly complete and perfect laws, drawing the principle of life from the legislature, and looking to no other power to clothe them with the compulsive power of a rule.    Unlike the Act of 1846, they do not make the repeal of former laws and the creation of new substantial ones to depend on the fiat of the popular vote."

The principle which we have set forth as governing this case, was held to be the true one announced in *The Commonwealth* v. *Quarter Sessions*, 8 Barr, 395.    In that case a new township, called Washington, being created out of the old township of Bethel, the legislature, by the 13th section of the Act of 1847, provided for an election in the township to determine, by ballot, whether the new township should be continued, and it was held constitutional.    The same principle is also held in *Commonwealth* v. *Painter*, 10 Ib. 204 ; and more recently in two cases, *Moers* v. *The City of Reading*, and *Sharpless* v. *The Mayor of Philadelphia*, reported in 21 Penn. (9 Harris) R. 188 and 147, in reference to laws which referred it to the vote of the people, as a contingency on which stock was to be subscribed.

In Delaware the same principle has prevailed.    In that State a law, submitting the question of granting licenses to retail in the several counties, to the votes of the people in each county to determine for themselves, was held unconstitutional in the case of *Rice*

v. *Foster*, 4 Harrington's Rep. 479 ; but that case stands upon the same principles, the same course of reasoning, and the same peculiar grounds on which the case of *Parker* v. *The Commonwealth* was decided in Pennsylvania.

The act in question, in this case, was nothing more than a project prepared by the legislature, and submitted to the people of each county,—it had no other object.   It was entitled "An Act to authorize the people to decide by ballot whether the license to retail liquors shall be permitted among them," and it provided that, on application of one-fourth of the voters of any county at any time within an interval of one year, the vote might be taken.   All the provisions relate solely to the mode of taking the vote and conducting the election, and the consequences of a vote of no license, except the 7th section, which provides that, in case the vote in any county should be for license, "then the law already in force regulating licenses should remain in force in said county."   The court held this law unconstitutional, on the ground that the law then existing authorizing license, was the law until repealed by the legislature ; that this act did not undertake to do so, but purposely avoided it, and the right to do so transferred to the people of each county for themselves ; that the legislature has no power to pass an act which is not a law in itself when passed, and has no force and authority as such, and is not to become a law until it shall have been created and established as such, by the will of some other body, by whose will also existing laws are to be repealed or adhered to and supplied ; that in a legal sense this is not a law, it is not complete and perfect in itself.   It was not a rule prescribed by the supreme power, &c., but was to become a rule only when sanctioned and created by the people ; that it was in the nature of a bill prepared and presented by the legislature to the people, to be enacted or rejected.   The court shows the distinction between this and other conditional laws, which are complete and perfect in themselves when they passed from the hands of the legislature, but are dependent for their effect and operation on a contingency provided.   That such a contingency may be a vote of the people, in the opinion of the court, is manifested by its reference to the Delaware school law, which was precisely of the same character with the Pennsylvania school laws, and with the levee law, imposing a tax in certain districts for school

purposes, but requiring that no tax should be levied or assessed in any school district, unless upon a vote by ballot there shall be a majority for the tax.  This law the court held to be valid, on the ground that no power was given by it to repeal or change any part of the existing law, nor did its existence depend on the performance of the condition, nor in any manner upon the will or acts of others. Thus drawing plainly the distinction between submitting it to the people whether a particular project shall or shall not become a law, and submitting it to the vote of the people as a contingency on which the law shall go into operation, whether the tax proposed in it shall be levied,—which latter contingency they held a valid one.

The principle thus announced had been fully maintained by the same court in a case decided before, the case of *Stuart* v. *Jefferson*, and reported in 3 Harrington, 335, where the Delaware school laws, identical in principle with the levee law, were sustained.

We have been thus particular in examining the cases in New York, Pennsylvania, and Delaware, because they are the only States in whose jurisprudence we have found a doubt hinted of the validity of such legislation when applied to particular districts or localities, and we think it will be conceded, on a critical examination of the cases, that they clearly and plainly maintain the principle for which we contend.

There is one observation we would make on the cases thus far cited.  They manifestly establish the doctrine that such legislation, especially when local in its character, is valid even in those cases where the act does not go into immediate force, but for its operation and effect awaits the contingency of the expressed will of the people at the ballot box.  While it is not necessary for us to maintain the proposition in so broad a form, since in this case the law is complete and perfect in itself, and goes into immediate effect, and the only contingency provided is that by a future vote of the people, the law itself is not repealed, but the execution of one of its provisions suspended,—a distinction on which we shall hereafter comment.

In looking into the decisions of other States, we find a uniformity of adjudications on this point which, in our opinion, leaves no doubt on the subject.

In Virginia, the question has been most fully and ably discussed in the case of *Bull et al.* v. *Read et al.* 13 Grattan, 78, decided in

1855.  An act of the legislature of Virginia, passed in 1853, enacted that that portion of Accomac county, known as the first magisterial district, be established as a distinct district from the balance of the county, for the establishment of a free school.  The County Court of the county was directed to order a vote to be taken in the district "for or against the establishment of a separate free school system in said district."   If three-fifths of the votes were in favor of it, then it should be established, and commissioners were to be appointed, clothed with large powers, amongst others that of taxation.   The constitutionality of this law was denied on two grounds: 1. Because the legislature had no power, under the Constitution, to make the operation of a law depend upon the result of a vote of the people, or a portion of them.   2. Because it could not delegate the power of taxation to a board, such as that created by the enactment.  The statute was, however, sustained against both objections. After showing, by reference to various instances and authorities, that it is within the discretion of the legislature to make a law to take effect at some future time, and upon some contingency thereafter to happen, the court proceeds to say : " It must be for the legislature to judge, in what contingency or upon what condition the law shall take effect.   They (the legislature) must have power to prescribe any they think proper, and if the condition be that a vote of approval shall be first given by the people affected by the proposed measure, it is difficult to see why it may not be as good and valid as any other condition whatever."

" There can be no inherent vice in the nature of such a condition which shall serve to defeat the act, when it would be legal and effectual if made to depend upon some other event.   To say in such a case that the act is made by the voters and not by the legislature, is to disregard all proper distinctions, and involves an utter confusion of ideas on the subject.   Whenever the contingency on which a law is to take effect, depends upon the action of third persons, it might be said with equal truth that the law was made by those persons instead of the legislature.   But there is a plain distinction between the act to be done by the voters, and the legislative function.   They have no power to alter or amend the act, or substitute something else in its place.   When it passed the Assembly with the forms and in the mode prescribed by the Constitution, the legisla-

tive function was exhausted, although, by its terms, it required a vote of approval by the people interested, before it went into operation. But when that vote was given, and the result ascertained in the mode prescribed, the act became as operative and effectual as if it had simply fixed upon that day for its commencement."

"That its operation should depend upon the result of the vote is as much a part of the legislative will, as any other part of its provisions, and there can be no difference in principle depending on the nature of the event or contingency on which the act is to take effect, though the differences in kind and degree may be without end." The court then proceeds to refer to the various instances both in State and Federal legislation, in which the contingency on which an act was to take effect, was a vote of the people; the case of the retrocession of the county of Alexandria to Virginia, made to depend upon a vote of the people of the county, the constitutionality of which was recognized in 7 Grattan Rep. 68; *McLaughlin* v. *The Bank of Potomac*, and other instances. The court also reviews the cases in Pennsylvania, Delaware, and New York, and cites many others, from which it draws the conclusion that contingencies of this nature have been uniformly recognized as valid.

We invite the attention of the court to the following: *Commonwealth* v. *Quarter Sessions*, 8 Barr, 391; *Commonwealth* v. *Painter*, 10 Ib. 204; *Missouri* v. *Scott*, 17 Missouri Rep. (2 Bennett), 621; *Talbot* v. *Dent*, 9 B. Monroe, 526; *Studant* v. *Jefferson*, 3 Harrington, 335; *Burgess* v. *Pue*, 2 Gill. 11; *Bridgeport* v. *The Housatonic Railroad*, 15 Conn. 475; *Slack* v. *The Maysville and Lexington Railroad*, 13 B. Monroe, 1.

In the State of Vermont the same rule has prevailed. In that State, by the law of 1844, a uniform system in relation to licenses to retail was established, and provision made for the appointment of commissioners in the several counties to grant them; by a subsequent act of 1846, it was provided that the sense of the freemen in each county should be taken annually on the subject, and if a majority should be for licenses, the county court was authorized to grant them; but if the vote was different, no license could be granted during the year.

In the case of *Bancroft* v. *Dumas*, 21 Vermont, 456, this was held to be a valid act, on the ground that it had all the forms of law, and

was enacted by the legislative department; but whether it should be a prohibition or authority was made to depend on the vote of the people.    The court reviews the case of *Rice* v. *Foster* and *Parker* v. *Commonwealth*, and places the construction on them which we have already given in this brief, showing that the principle there held was not applicable to the Vermont act, because it was a law in itself when passed by the legislature, and had the force and authority of law independent of the vote, though the vote was to determine whether or not it should be an authority or prohibition. "The statute," say the court, "is complete in itself without the act of the freemen, and it is no objection that it is made to depend upon the expressed will of the people whether it shall operate as an authority for granting license or a prohibition."

But a still more satisfactory declaration of the doctrine is found in *The State* v. *Parker*, 26 Vermont Rep. 357.    The question there arose upon a license law of 1852, in which there was a provision that it should come into force on the second Tuesday of March, 1853, with a proviso "that meetings of the freemen of the State should be holden on the second Tuesday of February, 1853, to vote their judgment and choice in regard to the act;" and if a majority should vote "no," "then the act shall take effect in December, 1853."    The annual sessions of the legislature were in October, so that the object of the proviso was, in the event of a negative vote, to suspend the act until after the next session of the legislature, which might repeal it.

The court in this case reviewed all the authorities, especially those in New York, Pennsylvania, and Delaware, and held the law to be valid.    We quote a portion of the opinion: "But the law of 1852 did not even in form depend upon a vote of the people for its coming into force."    "The statute in terms was made to come in just when it did, on the second Tuesday of March, 1853, and if there had been no meetings of the freemen called, or no vote had been taken, the statute would still have become a law, just when it did. The only thing made conditional or contingent in the statute, was that in one single event the operation of the law should be suspended until after the next session of the legislature."    Again, the court says: "It cannot be said with any show of fairness that the legislature did not enact the law, and fully pass upon all questions of

constitutionality or expediency involved in the subject, and it is admitted on all hands that the legislature may enact laws the operation or suspension of which shall be made to depend upon a contingency. This could not be questioned with any show of reason or sound logic. It has been practised in all free States for hundreds of years, and no one has been lynx-eyed enough to discover, or bold enough to declare, that such legislation was on that account void or irregular."

After citing various instances of legislation, made to depend, "not only for the time of their coming into force, but for their vitality, upon the future contingency of a vote, especially cases of the alteration of county and town lines, and places of holding courts," &c., the court proceeds to say: "If the operation of a law may fairly be made to depend on a future contingency, then, in my apprehension, it makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and a legal one, not opposed to sound policy, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one." And again: "The contingency on which the present statute was to be suspended, until another legislature should meet and have an opportunity of reconsidering it, was not only proper and legal, and just and moral, but highly commendable and creditable to the legislature." Again: "The distinction attempted between the contingency of a popular vote and other future uncertainties, is without all just foundation in sound policy or correct reasoning, and has been too often made, more from necessity than choice."

This case seems to be conclusive, in principle and reasoning, on the question under discussion. It is identical in fact with the one under discussion, with two exceptions, which seem to render the latter even less obnoxious to the constitutional objection. 1. In that case, the vote of the people was to have the effect of suspending the operation of the law itself, whereas, here the vote was to have only the effect, not of suspending the operation of the law, but of preventing the execution of one of its sections. 2. There the law was a general one, affecting the whole State. Here it is a local one, in regard to which, legislation of this kind has been universal, and in connection with which, it is manifestly recommended by its peculiar propriety.

In New Jersey, the same course of decision has prevailed.   In *The City of Paterson* v. *The Society for Establishing Useful Manufactures*, 4 Zabriskie, 395, the question arose upon the validity of a law submitting a charter of incorporation to corporators.   The case was decided on the independent ground, that the constitutional difficulty did not arise, as the legislature could not force the charter upon the corporators without their assent; but the question was pressed, and the court decided it, reviewing the cases in Pennsylvania, Delaware, and New York, and held the true distinction to be, that such legislation is only void when the law is made to depend upon a popular vote upon the expediency of the enactment itself.

The question has also been before the courts of Ohio, and the same principle there established.   The whole subject was ably reviewed in the case of *The Cincinnati, Wilmington, and Zanesville Railroad* v. *Commissioners of Clinton County*, 1 Ohio State Rep. (McCook), 77.   The Act of 1851 required the commissioners of Clinton county, with the consent of a majority of the voters, to be expressed at the regular election in 1851, to subscribe to the capital stock of the Cincinnati, Wilmington, and Zanesville Railroad, and levy a tax for the purpose.

The court sustained this law, on the ground that it was not a delegation of legislative power.

In discussing the subject, it said: " It is undeniable that the complete exercise of legislative power does not necessarily require the act so to apply its provisions to the subject-matter, as to compel their employment without the intervening consent of third persons, or to prevent their taking effect only on the conditions expressed in the law.   The whole body of our legislation, as well as that of other States, is divided between laws which imperatively command or prohibit the performance of acts, and those which authorize or prevent."   And proceeds to cite instances of this kind of legislation, especially school laws imposing taxes on the contingency of a vote of the people, and other laws providing for the erection of town houses and the imposition of taxes for the purpose, on the same contingency.

Again, the court says : " In what does the discretion given to the voters in such cases consist ?   Certainly not in fixing the terms and

conditions upon which the act may be performed, or the obligations thereupon attaching. These are irrevocably prescribed by the legislature, and when called into operation, conclusively govern every step taken. The law is, therefore, perfect, final, and decisive in all its parts, and the discretion given only relates to the execution. The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law."

And again: "But the power of deciding on its execution, so far from being contradictory to, or inconsistent with the act, is the condition prescribed by the law-making power itself, on which alone it is permitted to have effect. It is not the vote which makes, alters, or even approves the law; but, as well remarked by one of the counsel, it is the law which makes the vote, and prescribes everything to be done in consequence of it."

Again: "These views lead to the conclusion, that an enactment is not imperfect which makes its execution depend upon the contingent approval of persons designated in it, and that a county organization may be clothed with this discretion; and if the commissioners,—the agents of the county,—may exercise it, it seems too clear to be doubted, that it may be conferred upon the body of those they represent."

In Illinois the rule is the same. See *The People* v. *Reynolds*, 5 Gilman's R. 1. In 1847, the legislature of that State passed a law to divide the county of Gallatin, with a proviso, in the 10th section, that the vote of the people of the county should be taken whether they wished the division or not; and that the law should only go into operation in the event that a majority of the voters at such election desired a division. This act was held constitutional; that it was complete and perfect as it passed, though its principal provisions were only to take effect upon a contingency,—the determination of which did not depend upon the exercise of legislative authority by the people, but upon an expression which they were authorized to make, rather in the execution than in the enactment of the law.

The court says: "Legislative powers cannot be delegated, but the true meaning of the maxim depends upon a proper understand-

ing of legislative powers. It is easy to say that it is the business of the legislature to make laws; but what kind of laws? Must they be full, complete, perfect, absolute; depending on no condition, and conferring no discretion? Constitutional learning has nowhere advanced so far."

Again: "The history of legislation in past ages determines what may, and should be properly done, in the exercise of legislative power. While legislators are bound to make the laws, they need not be absolute, nor make every provision for doing that which they may authorize to be done. While all must be done under their sanction, yet they need not do all, nor command all. A law may depend on a future contingency for its taking effect, and that contingency may arise from the voluntary act of others."

Putting the case of laws, creating public and private incorporations, and also counties which may be submitted to the acceptance of the corporators or citizens of the county or town established, all such laws, it says, "are perfect and complete when they leave the hands of the legislature, though a future event is to determine whether they are to take effect or not."

And again, says the court: "The legislature may pass laws requisite for the government of a particular city, township, or school district, and who will doubt the power and propriety of authorizing this to be done by the people within the limits of the city, town, or district, by their local representatives, or even directly. This is making laws, and laws too of as binding efficacy as if passed by the legislature. They are dependent on the legislature for their validity and force, through the act of incorporation or law under and by virtue of which they were made."

This case, as well as the preceding one cited from Ohio, review *in extenso*, the cases in 6 Barr, and 4 Harrington, and place them on their proper grounds.

In Maryland the rule is the same as decided in *Burgess* v. *Pue*, 2 Gill. R. 11. In that case, an act providing for the public instruction submitted the question of its operation in the several counties to the vote of each, and if a majority in any county should be in favor of the act, it was to be valid in such counties, but otherwise of no effect. This was held constitutional; and in the same case another act, which gave the inhabitants of school districts

the right by a vote to impose taxes, was held valid, on the ground that the legislature had the right to delegate the power to tax, under such circumstances, to the people; such grants of power, it was said, "were coeval with the Constitution."

The same principle is also established in the State of Kentucky. *Slack* v. *Marysville and Lexington Railroad*, 13 B. Monroe, 1. In that State, by the Act of 1850, certain counties and cities were authorized to subscribe stock in a railroad, but the act provided for election by the people in said cities and counties, and on the contingency of a majority voting for the subscription, it was made the duty of the mayor and council of the city in the one case, and of the County Court of the county in the other, to subscribe and lay a tax. The law was held to be constitutional in a most able and elaborate opinion delivered by Chief Justice Marshall, on the ground that all the legislative power of the commonwealth is, by the Constitution, vested in the legislature, subject to no restraint, except such as is imposed by the fundamental law, its own wisdom and responsibility; and it may carry its laws into effect by the executive alone or in conjunction with the judicial power; or it may create other agencies, when the object is to accomplish local or individual purposes; and such local agencies may be selected and created by the legislature for the purpose of carrying its power into all parts of the commonwealth, or into such parts as may require its application for their benefit or coercion.

And again, says the court: "It is not essential to the character and force of a law that it should itself command everything to be done for which it provides. The power to command a particular thing to be done, includes the power to authorize it to be done. The act done under authority conferred by the legislature, is precisely as legal and valid as if done in obedience to a legislative command."

Again: "That the legislative power is competent to the imposition of local burdens or taxation, for the accomplishment of local purposes, has not been, and cannot be denied;" and it is no objection to the validity of such laws, that their effect and operation are to be submitted to a vote of the people of the locality to be affected by them. "The power to coerce local contributions being established by general usage, and by the apparent justice and propriety of the

thing, and being deducible from the general powers and duties of the government, it belongs primarily to the commonwealth as a legislative power inherent in it, and which cannot be exercised by any portion of the people, whether in an organized or unorganized form, without the consent of all who are to be subjected to it, except so far as such portion of the people may be authorized by the legislative power to act upon the subject with obligatory effect."

The same principle is held in the case of *Talbot* v. *Dent*, 9 B. Monroe, 530; and in the States of Tennessee, Iowa, Connecticut, and Missouri, see *Nichol* v. *The Mayor of Nashville*, 9 Humph. R. 252; *Souto* v. *The State*, 2 Iowa R. 205; *Housatonic Railroad* v. *Bridgeport*, 15 Conn. R. 475; *State* v. *Scott*, 17 Missouri R. 521.

Finally, on this point, we can perceive no distinction between the statute under discussion, and the levee law of Issaquena county, held constitutional in *Williams* v. *Cammack*, 27 Miss. R. 209. In that case the proviso was, " that if a majority of the voters should enter a written protest against the provisions of the act, before the board of police, at the first meeting after the 4th of July next, then the act should be void and of no binding force."

The objection was made that the law was not valid, because its operation was made to depend on the determination of a majority of the voters of the county; but the court overruled the objection, saying, that it was founded on a misapprehension of the provision. " The act, in its terms, possessed every essential quality of a complete and operative legislative act. Nothing was required to be done by the people to give it force and effect." And again: " This protest," provided for in the 12th section, " certainly gave no force to the act, but was intended expressly to put an end to its operation." Again: " Being a local act, affecting only the property-holders of a particular county, and intended for their benefit, it was provided that they should have the privilege of putting an end to its operation in the manner prescribed by the act. Otherwise, that it should continue. It derived no legislative force from the action of the voters, but quite the reverse. While the act, therefore, is liable to no technical objection, by reason of its depending for its legislative force upon the sanction of the voters, we can perceive nothing unjust or illegal in the policy of submitting to the determination of those intended to be affected by it, whether they will carry out its

provisions. We think, therefore, there is no force in this objection." In that case the protest provided for was to have the effect to put an end to the operation of the law. Here the vote is to have precisely the same effect as to one of the provisions of the act. If the proviso in the one was valid, the other must be so, for they stand on identically the same ground. But it may be said that the condition in the case in 27 Miss. R., presented by the proviso, was a subsequent one, and could not, even if void, have affected the act. So also is the proviso here, as we will hereafter show.

The same ruling was made in the case of *Strickland* v. *Miss. Central Railroad,* decided about the same time, but not reported. In that case, the Act of 1852 authorized the boards of police of certain counties to subscribe for stock. The proviso was, "That an election should be holden, &c.," and if at such election a majority of the qualified electors should be in favor of subscription, then the board of police shall make such subscription; but if a majority should be opposed to such subscription, the same should not be made; and this was held to be a valid law, after full argument.

The argument, thus far, has proceeded upon the ground that the statute under discussion contains no delegation of legislative power, and the authorities cited fully justify us in saying that the following propositions are established by them.

1. That an act of the legislature, which by its own provisions goes into operation and effect, on the contingency of a vote of the people in its favor, is not a delegation of legislative power.

2. That it is competent for the legislature to pass a law to take effect on a contingency, which the legislature may prescribe, and of which they alone must in the nature of things be the judge.

3. That there is nothing in. the nature of the contingency, submitting to a vote of the people the question whether the act shall go into effect and operation, which shall serve to defeat it, when it would be legal and effectual if made to depend on any other event.

4. That in such legislation the determination of the contingency does not depend upon the exercise of legislative authority by the people, but upon an expression of their will, which they are authorized to make, rather in the execution than in the enactment of the law. See the cases in 13 Grattan, 5 Gilman, and 1 Ohio (McCook).

5. That where the law is not a mere project, or bill prepared and

submitted to the people, to determine whether its provisions shall become a law, although the things commanded to be done by it are only to be done on the contingency of a vote of the people, it is not a delegation of legislative power.   See the New York cases.

6. That where the act is complete and perfect in itself, and goes into effect as a law, and does not require a vote of the people on the question, whether it shall be enacted as a law, it is not a delegation of legislative power, but is a valid act of legislation, although all its provisions, or all that it commands to be done, may be made to depend upon the contingency of a vote.

7. That in such cases the rule of action emanates from the legislature, and all the terms and conditions of the law are prescribed by it, the question of its execution being alone submitted to the contingency of a vote, which the legislature may do.

8. That such laws are in the nature of grants of power, which are complete and perfect, but dependent on a contingency, which the legislature has the right to prescribe, and of which it is the sole judge.

9. That the legislature has the right to grant the power of taxation for local purposes, and to prescribe what conditions, it, in its wisdom, shall think just, including the condition of an affirmative vote of the people to the exercise of such power.

10. That in such cases, the condition prescribed on which the law is to take effect, and its taking effect only on such condition, is as much a part of the will of the legislative power as any other provision of the law; but the condition being performed, its provisions derive their authority and force, as rules of action, not from the vote, but from the sovereign will of the supreme power.

1. Before quitting this branch of the subject, we would remark, that all, or nearly all, the cases cited, are upon the validity of enactments which, by their terms, were not to go into operation or effect as laws, except on the contingency of a vote of the people approving them, and that the only cases in which such enactments have been held void, were those in which, in substance, the question was submitted to the people,—not whether the law should go into effect and be executed, but whether the law itself should be enacted; while the levee law has the advantage over the enactments in both the classes of cases referred to, in these two particulars: 1.

That the vote to be taken is not on the question of approval of the law, but simply on the question, whether the people of the district are willing to submit to the taxation proposed, in consideration of the benefits to be derived from it.    2. That the act goes into effect immediately, and does not for its effect and operation, depend on the contingency prescribed, but the execution only of one of its provisions is to be defeated in a certain event.

The condition, therefore, is a subsequent one, which if valid, can only have the effect in a certain event to suspend or defeat the execution of part of a law which, by its terms, goes into immediate effect.    A circumstance on the effect of which we have elsewhere commented.

2. We will proceed to show that legislative power may be in a certain sense delegated either to the people or to persons or bodies designated by the legislature.  A distinction is taken between local and general legislation.    The Parliament of England, and the legislative bodies of this country, have immemorially exercised the right of transferring to particular bodies or divisions of the people, as counties and municipalities, or local districts established for the purpose, the right to enact laws binding on the people of such localities, and especially to enact laws imposing taxation for local purposes in such districts.    This right has been generally exercised and uniformly sustained in the courts as a portion of the legislative power, and was therefore necessarily committed to the legislature in the Constitution when it conferred the legislative power of the State ; and it is manifest that the exercise of such right by the legislature is not an abdication by it of its constitutional power, nor an attempt to transfer that power to another body.    It is simply the right of employing other agencies in effecting its own legitimate and constitutional purposes, such agencies always acting in subordination to the legislature and in subjection to it, not possessing an independent but a derivative power, which may at any moment be controlled or annihilated by the supreme authority of the legislature.    To say that legislation of this description is a delegation of the constitutional power and office of the legislature, is an abuse of terms.    The power transferred bears no resemblance to legislative power, in the sense of that term as employed in the Constitution, since it is not supreme or paramount, but subordinate and

transient. If, then, such a power can be delegated to local bodies, to counties, to commissioners, for particular purposes in particular localities, to quasi corporations created for that purpose, and to municipal bodies, which are but portions of the people organized for local legislative purposes, and are but creatures of the legislative will, no reason can be assigned why such a power of a local character may not be delegated to the body of the people of the locality to be affected by it. That the powers thus conferred, as we have said, immemorially by the supreme power on local bodies or districts, or local agencies for local purposes, may, in a certain limited sense, be called legislative powers, is true, for they are powers to make laws and rules of action binding on the district or locality, or persons to whom they apply ; and this kind of legislative power has been constantly delegated by the sovereign authority since the dawn of our history. But to say that these powers are legislative powers in the sense of the term employed in the Constitution, is a manifest misapprehension of its meaning, since they are not supreme and sovereign and irrevocable, but, as we have said, subordinate, and their employment by those in whom the legislature has invested them, is but the exercise of an agency under the supreme legislative authority, in subordination to and in consummation of its will.

The idea we are endeavoring to convey is well expressed by the Supreme Court of Illinois in the case already cited. After declaring that the function of such bodies or agencies is making laws of as binding efficacy as if passed by the legislature, but that such laws are dependent upon the legislature for their validity and force, through the act of incorporation or law under and by virtue of which they are made, the court proceeds subsequently to say : " We think enough has been said to show that the legislature may delegate authority either to individuals or bodies of people to do many important legislative acts, not only similar to that authorized by the law, the validity of which is in question, but others of a more important, and on a principle of a much more questionable, propriety ; but in doing this, it does not divest itself of any of its original power ; it still possesses all the authority it ever had. It is still the repository of the legislative power of the State." *People* v. *Reynolds,* 5 Gilman's Rep. 19, 20.

The language we have already quoted from the opinion of Chief Justice Marshall, of Kentucky, in reference to the power of the legislature to select or create agencies to carry out its will, by the enactment of laws which locally have the force and effect of rules of action, expresses the same idea.

The idea which we wish to present is, that the legislature in conferring on local bodies, or districts, or localities, the right to enact certain kinds of laws to be of binding force, is but creating or selecting an agency to execute its own will and purpose; and that while it invests such bodies with the discretion of prescribing rules and regulations having the force of law, the exercise of such discretion has its origin in the legislative will, which conferred it for purposes of local necessity or benefit.   In this view of the matter nothing can be clearer than that, if the legislature can select or create such local agencies, in whom it vests a discretion to enact certain ordinances or rules having the force of local laws, it would also have the power to vest such agencies, with the power of suspending the operation or execution of a local law passed by itself.   But in either case, whether in enacting a rule or suspending a local law, though in form the action of the body holding the delegated power is legislative, in substance it is but executive, and its function is to consummate the supreme legislative will.   We may add, that it does not admit of doubt, if the legislature can confer such power on commissioners, trustees or agents, under whatever name, they could certainly confer it on the people.   In the language of the Supreme Court of Ohio : " If the commissioners, the agents of the county, may exercise it" (the power of approving a local legislative enactment), " it seems too clear to be doubted that it may be conferred on the body they represent."

We will not pursue this point further, but observe that the delegation of such powers by the legislature to local bodies has been universal, and the submission of a question of the kind to the vote of the people of a local district is a power of identically the same kind.   In either case the rule of action, when established, derives its force and effect from the supreme legislative power.   We conclude this point by asking the attention of the court in connection with it to the case of *Bull* v. *Reed*, 13 Grattan, 78, and the cases there cited; 5 Call. 139 ; *Godden* v. *Crump*, 8 Leigh, 120 ; *Har-*

*rison Justices* v. *Holland*, 3 Grattan, 247 ; *Burgers* v. *Peel*, 2 Gill, 11 ; *Livingston* v. *Mayor of New York*, 8 Wend. 85 ; *Thomas* v. *Leland*, 24 Ib. 65 ; *Lockhart* v. *Harrington*, 1 Hawks, 408 ; *Cheaney* v. *Hooser*, 9 B. Monroe, 330 ; *Talbot* v. *Dent*, Ib. 530 ; *Housatonic Railroad* v. *Bridgeport*, 15 Conn. 475 ; *Slack* v. *Maysville and Louisville Railroad*, 13 B. Monroe, 1.

It may be, however, urged that in the delegation of such powers the legislature is limited in its selection to such bodies as are known to the Constitution or to municipal corporations.   We perceive no force in such a suggestion.   If we have succeeded in establishing our first point, that there is no delegation of legislative power, but that the act is complete and perfect in itself, dependent for its effect on such a contingency as the legislature has the right to prescribe, the question does not arise as to whether the legislature is limited in its selections of the bodies or persons to whom it may delegate such power, but the sole inquiry would be, whether the legislature has the right to impose local taxation without limiting itself in so doing to county and municipal boundaries ; and this question does not now admit of discussion. It is expressly maintained in the case of *Williams* v. *Cammack*, 27 Miss. 219.   In that case, portions of the county of Issaquena were exempted from the tax, that is, all such lands as lay outside of the levee, so that the direct question arose, whether the legislature, for public purposes, could impose local taxation in a district created by itself, independent of county or municipal decisions or boundaries.   The question arose on the objection, that the exemption of some of the lands conferred exclusive privileges upon the owners ; but the court overruled the objection, saying, " that it is universally conceded that the power of taxation, whether for general or local purposes, and the mode and manner of exercising the power, not within the prohibitions of the Constitution, appropriately belong to the legislatures of the States.   This power may be unwisely exercised or abused, yet it is a power intrusted by the Constitution to the legislature, which while exercised within the scope of the grant, is subject alone to their decision, with which the judicial tribunals have no right to interfere, because in their judgment the action of the legislature is contrary to the principles of natural justice."

But this question has been frequently the subject of judicial in-

vestigation, and with uniform result. The power of the legislature for such purposes was sustained in the case from Kentucky already referred to,—*Slack* v. *Maysville and Louisville Railroad*, 13 B. Monroe. See pages 22, 23, 36.

The question also arose in *Cheaney* v. *Hooser*, 9 B. Monroe, 330. In that case the legislature extended the chartered limits of the city of Hopkinsville so as to embrace certain. territory and inhabitants not before in the corporate limits. The taxing power had been granted to the city by its charter before the time that the limits of the corporation were thus territorially extended, and after the extension, the city, under the taxing power previously granted in the charter, taxed the property in the added territory, and as the court said, " The authority of the act, so far at least as this case is concerned, depends upon the broad question of legislative power under the Constitution." The act was held valid, and thus the power to tax a local district not embraced in any legal subdivision of country whatever was established. The court held that the legislature, having the power to impose a local tax for local public purposes, might give that power to the corporators, and might subject the people of the added territory to such power under its general power of taxation, against which there is no safeguard in the Constitution, the provision in regard to taking private property for public use having no reference to the power of taxation.

That this power does not derive itself from any mysterious efficacy, in the fact of the incorporation of municipalities, to which it has been from time to time granted, is made clear in another case in Kentucky, *The City of Lexington* v. *McQuillon's Heirs*, 9 Dana, 515, 516, where the 11th section of the charter of the city of Lexington gave power to the corporation to " cause and procure all the streets and alleys in the city to be paved or turnpiked, at the cost of the owners fronting such streets or alleys." This was held a valid law, the court saying, " that the legislative authority to establish municipal corporations, and to delegate to them any local power which the legislature itself possessed, has not been controverted and is not doubted ; but it is equally indisputable, that no local power could have been delegated to the city or can be constitutionally exercised by it, unless the legislature itself possessed the same power and might have exercised it."

In *Grant* v. *Courtner*, 24 Barb. 238, the Supreme Court of New York says : "There is nothing in the Constitution prohibiting the legislature from exercising the taxing power for a public purpose upon a particular district or locality, or taking from the legislative discretion the mode in which it shall be exercised."

In *Clarke* v. *City of Rochester*, 24 Barb. 447, it was urged, in case of a law giving the taxing power to aid in the construction of a railroad, that, as the city was a municipal corporation, and as such organized only for political purposes, it could only exercise or be authorized to exercise the right of taxation in respect to the proper public business incident to the city government and the exercise of its political powers. "This position," said the court, "involves a discussion of the theory and powers of government under our system ;" and proceeding to investigate the nature of the taxing power, the court shows it to be unlimited and undefined, and "that short of taking private property for public use without compensation, and so far as the tax is general and imposed on all of a class of persons within prescribed limits or districts, upon some common principle or rule, and the tax is for some public purpose, there is no limit to the power of the legislature to authorize taxation." And accordingly it was held that, under the general power of taxation for local purposes, the legislature might confer the right on municipalities to tax those within their limits; citing *Thomas* v. *Leland*, 24 Wend. 65; *Mayor of New York* v. *Livingston*, 8 Ib. 85; *Sharpless* v. *Mayor of Philadelphia*, 21 Penn. (9 Har.) 148 ; 4 Comstock, 456 ; 1 Ohio State Rep. 78 ; 15 Conn. 475 ; 8 Leigh, 120 ; 9 Humph. 252 ; 9 B. Monroe, 526, and 13 Ib.

Upon examination of the question in connection with the grant of this power to municipal corporations, it will be seen that it has generally arisen under an objection like that in the last case,—that the power was inconsistent with the nature and purposes of the corporation ; and the courts, in response, so far from referring to any principle applicable to corporations as authorizing the grant of the power, hold that the right to confer such power on such corporations is drawn from its general legislative power; and it may, therefore, be conferred on any municipal corporation, without reference to the purpose for which it was organized. See the cases above cited. The court holds distinctly, in *Clarke* v. *The City of*

*Rochester*, that there is no doubt of the power of the legislature to impose local taxes in particular localities and neighborhoods, and to delegate such power, and the right to confer such power on the county or corporation is not derived from its corporate political existence, but exists in spite of it, and is founded on the legislative right to impose a tax on a district to be prescribed by itself.

The same doctrine is maintained in *Bank of Rome* v. *Village of Rome*, 18 N. Y. Rep. (4 Smith) 28, and other cases in New York.

But the question has more directly arisen in several of the States, in reference to powers conferred on cities to impose taxation on the owners of lots in particular localities, for local improvements in such localities, and the power has been uniformly upheld. In *People* v. *Brooklyn*, 4 Comstock's R. 419, the subject was fully discussed. The question there arose on the provision of the charter of the city authorizing the city council to cause streets to be graded, levelled, gravelled, paved, or McAdamised, and the expense of the same to be assessed on such lot-owners as should be benefited; and under this provision, Flushing Avenue, one of the streets of the city, was graded and paved, and the cost assessed on the owners or occupants of the lands benefited; that is to say, the assessment was made on those who owned or occupied lots adjacent to the street, and they were therefore a locality or neighborhood not embraced in any legal subdivision of the city. The point was made, that this was taking private property without compensation; but the court held, that the assessment was an exercise of the taxing power, and did not fall under the constitutional provision on that subject. The distinction is pointed out between the taxing power and the right to take private property for public use. In the one case, the compensation to the individual is in the protection he receives from the government, and the tax is but his share of contribution to the public burden; while private property is taken for public use, not as the owner's share of the public burden, but as so much beyond his share, for which compensation in money must be made.

"It is conceded," says the court, "that the grading and paving of Flushing Avenue was a public work, the expense of which might rightfully have been raised by general taxation on all the taxable inhabitants of Brooklyn. The legislature thought proper to shift the burden upon that part or class of the taxable inhabitants ex-

clusively, whose lands were benefited by the work, and to impose it on them in proportion to the benefit received."

Again, the court says: "This assessment, therefore, was taxation, and not an attempt to exercise the right of eminent domain."

And again: "It remains to be seen whether anything could be found in the Constitution, in legal adjudication, in the practice of the government, or in the nature of things, by which taxation, on this principle of apportionment, can be judicially annulled."

The court proceeds then to examine the question on principle, and on authority, and holds that the power to impose such taxation undoubtedly belongs to the legislature, and may be by it conferred on local authorities. We quote a portion of the decision:

"The people have never ordained that taxation must be limited or regulated by any of the rules laid down in the case of The People v. The Mayor of Brooklyn, 6 Barbour. They have not ordained that taxation shall be general, so as to embrace all persons, or all taxable persons within the State, or within any territorial division of the State; nor that it shall or not be numerically equal, as in the case of a capitation tax; nor that it must be in the ratio of the value of each man's lands or goods, or both combined; nor that a tax must be coextensive with the district, or upon all the property in a district which has the character, and is known to the law as a local sovereignty."

The application of any one of these rules or principles to all cases, would be manifestly oppressive and unjust. Either may be rightfully and wisely applied to the particular exigency to which it is best adapted. Page 427.

And again: "There never was any just foundation for saying that local taxation must necessarily be limited by, or coextensive with, any previously established district. It is wrong that a few should be taxed for the benefit of the whole, and it is equally wrong that the whole should be taxed for the benefit of the few. The same principle of justice requires, that where taxation for any local object benefits only a portion of a city or a town, that portion only should bear the burden. There being no constitutional prohibition, the legislature may create a district for that special purpose, or they may tax a class of lands, or persons benefited, to be designated by the public agents to be appointed for

that purpose, without reference to town, county, or district limits." Pages 431, 432.

The court also shows that such legislation has been universal. "In England, the commissioners of sewers assess the lands affected by their operations without reference to other locality."   "In Massachusetts, meadows, swamps, and low lands may be assessed among the proprietors, for the expense of draining the same, without reference to any political district, and in proportion to the benefit which each proprietor derives from the work.   In Connecticut, the same power is given to commissioners for draining marshy lands.   In Pennsylvania, South Carolina, and Louisiana, taxation on this principle has been practised and sanctioned as constitutional; and in New Jersey, Maryland, Virginia, Ohio, and Indiana, it is understood that local taxation, upon similar principles, is authorized by law.   In New York, the system of local taxation on this principle has been in force for more than one hundred and fifty years."   Page 438.

This case is a most able and full exposition of the whole subject, and explains the right of such taxation on the most satisfactory grounds.   We beg leave to ask the court's particular attention to it.

The same point has been ruled with equal emphasis in the State of Ohio, where the question arose on the validity of a street assessment made by the city of Cleveland, under a provision of the charter.   It was contended that such taxation was invalid, unless coextensive with the limits of the city, because it was taking private property for public use, without compensation; but the court sustained the law on the same course of reasoning adopted in *People* v. *Brooklyn*, 4 Comst. 419.   See *Scovell* v. *The City of Cleveland*, 1 Ohio State Rep. 134, 135, 136, 137; see also *Bonsall* v. *Mayor*, 19 Ohio, 418.   The same principle was held in *Thomas* v. *Leland*, 25 Wend. 65.

In Illinois, the principle prevails, and taxation there has been imposed upon a precinct to maintain a bridge.   The Act of 1849, of that State, authorized the levy of a special tax on the owners of property in Rochford precinct to maintain a bridge, and appointed commissioners, whom it constituted a body corporate for the purpose of carrying out the authority authorizing them to impose the

tax. This law was held constitutional, the court saying, "that the legislature has the right to impose local taxes for specified purposes, and to determine what extent of territory should be subjected to their payment."

See also the same principle discussed in *Commonwealth* v. *Mc Williams*, 11 Penn. 61; *Owners of Ground* v. *The Mayor of Albany*, 15 Wend. 376.

The principle has been universal in its application to school districts, which have been established and taxes imposed in them, in many, if not most of the States, without any reference whatever to any boundaries except those provided in the laws themselves, and they have been uniformly held constitutional.

The authority of these cases has received the sanction of this court in the case of *Smith* v. *Aberdeen*, 25 Miss. 458, where the charter of the city granted authority to make street assessments without reference to any previously established boundary, the city being authorized itself to select and designate the locality which should bear the burden; and the validity of such taxation was sustained. The same principle is fully sustained in the case of *Williams* v. *Cammack*, 27 Miss. 219, in a quotation we have already made from this case, to which we again refer.

The principle on which all the cases go is, that the legislature has the right for local purposes to impose local taxation, and that the district or extent of country on which such taxation may be imposed in any case, may be determined by the legislature, and it may create a district for that purpose, or impose the taxation over parts of territory without the instrumentality of such district. The cases also fully establish the proposition that the legislature may transfer its power to bodies which it may create or select, and that such bodies are but the creatures and agents of its will; and if so, that as a creature or agent of its will in this particular, it may at any time select the people themselves of the locality to be taxed, to determine the question by a vote.

But let us now suppose, for the sake of the argument, that the legislature had no power to enact the proviso. The result would necessarily be, that the law must stand and the proviso fall.

Leaving out of view for the present that class of cases in which it is held that legislative power may be delegated for local purposes,

and as a consequence may be submitted to a vote of the people, whether as a condition precedent or subsequent to the enactment of a law, the court cannot have failed to perceive, that the true principle (though not always distinctly announced) of all those cases, which, recognizing the doctrine that legislative power cannot be delegated, yet hold that enactments of this kind are valid, is that the vote prescribed is not a condition precedent to the enactment of the law, though it may have been to its execution; and this principle has been applied to two classes of cases: 1. Those in which the law for its effect and operation awaits the contingency of a vote. 2. Those in which the law, though going into immediate effect, is subject to be suspended, defeated, or annulled by a vote.

We say this is the true principle, though not always distinctly so announced. It was, however, substantially so announced in the case of *Williams* v. *Cammack*, 27 Miss. Rep. 209; and distinctly so announced in *The State* v. *Parker*, 26 Vermont, 357.

We do not concern ourselves with the first class of cases to which the principle has been applied, but to the second, within which the cases both in 27 Miss. and 26 Vermont, fall. In the one, the law, though going into operation on the second Monday of March, 1853, was subject to be suspended until December, 1853, by a vote which was required to be taken before the law came into effect,—that is to say, on the second Tuesday of February, 1853.

This was expressly held to be a condition subsequent to the enactment of the statute; and it was held further, that while the legislature did have power to prescribe it, yet if they did not have such power, the statute could not be affected by it. In the other case, *Williams* v. *Cammack*, the law went into effect; but it was provided, that if the protest of a certain number of votes should be entered into before the board of police, on the 4th July next (after its passage), then the act should be void, and of no binding force; and this proviso was held valid, because the law itself derived no legislative force from the action of the voters, but was only subject to be defeated by it, and this the court said the legislature had the power to command.

So in the case of *Corning* v. *Green*, in 23 Barbour, 23, where the act required that the corporation of the city of Albany should "file their assent to it in sixty days, or that it would be void;" and

in the case, *Clarke* v. *The City of Rochester*, 24 Barbour, 446, the true principle evidently was, that as the condition prescribed could only serve to defeat an act which had already gone into effect, it was a subsequent one to the enactment of the law; and though it was held valid, had the court thought otherwise, it would evidently have held, that being subsequent and also void, it could not have defeated the operation of the other clauses of the act.

So the court also did in fact hold, in the case of *Santo* v. *The State*, in 2 Iowa Rep. 205.

Test the proviso in this case by these rules, and if void, it manifestly would not defeat the other provisions of the act. The language is: " Provided that the said tax, proposed to be levied and assessed, &c., shall first be submitted to the legal voters of the district, on the first Monday of January, A. D. 1859;" and if the vote shall be against the tax, then the same shall not be levied or collected.

This is manifestly a condition subsequent, and one too, the effect of which, if valid, would, in the contingency named, not be to annul or render void the enactment of the statute, but only to defeat the execution of one of its provisions.

The language used,—" the said tax shall first be submitted," &c.,—does not make a condition precedent. The word " first" cannot be construed to mean, first before this shall be a law, or even first before this law shall go into effect, but first before the tax shall be collected, or before the time when the tax is collected; or, in other words, first before the power herein granted shall be effectual.

To give it a different construction, and say that it prescribed a condition precedent to the validity of the act as an expression of legislative will, would be to make it inconsistent with the last clause of the act, which commands that it shall " take effect and be in force from and after its passage;" and if such inconsistency exists, the proviso would stand repealed on the well-recognized principle, that where different sections of an act are inconsistent with each other, the one which is last in point of time shall prevail.

It is therefore perfectly manifest, as we think, that the proviso prescribes a condition which is subsequent to the passage or enactment of the law, and that its only effect, if valid, would be to defeat,

not its passage or enactment as a valid expression of the legislative will, but only to suspend its execution so far as the tax is concerned, and thus defeat, in the contingency named, the power conferred.

The condition here, as in the case of *Williams* v. *Cammack*, could in no event happen until after the enactment went into effect and operation, and was complete as a rule of action. How could it then be precedent to its passage? How could the vote in any manner be upon the question, whether the act should be a law, or anything more in fact than the expression of a will, which the legislature had adopted as a contingency on which the execution of the law should be defeated?

In this view of the case, *Williams* v. *Cammack* is directly in point; and while the court there holds the contingency a valid one, it is manifest, if it had held it invalid, it would nevertheless have held that it did not affect the validity of the other provisions of the law, for even in the common law of conveyances a void condition subsequent does not defeat an estate already created.

This view is fully maintained in *State* v. *Parker*, 26 Vermont, 357, already cited, and in fact in most of the cases.

But again: suppose it to be a condition precedent, or was intended to be a condition precedent, and the legislature had no authority to make it by the Constitution, but had authority to make the law as it stands, without such a condition. The question then is, in a case of delegated power, does a void condition nullify that part of the act which was a valid execution of the power? We think not. We think the common-law doctrine, that conditions precedent must be performed before an estate can vest, and that although the condition may be void or illegal, still, as it cannot be performed if illegal, no estate can vest, has no applicability to the execution of delegated power. The common-law doctrine in regard to such delegated power is, that if the power authorizes the act to be done unconditionally, and the party annexes a condition precedent which he had no authority to do, the condition simply is void, and the power as executed is good. There is a manifest distinction between conditions precedent, in regard to vesting estates, and in regard to the execution of powers. Sugden on Powers.

Let us apply these principles: the legislature of a State has the power of the people to make laws delegated to it by the Constitu-

tion.   It is authorized, in the name of the people, to pass laws absolutely, and in certain cases conditionally, but it has no power to annex to a law a condition precedent, that it shall not take effect until voted for by the people.   But it does pass a law in execution of the power, and then annex the above unauthorized condition.   Is it not clear, according to the above principles, that the condition is void, but the residue of the law is valid?

It will also be observed, that it is the proviso alone that makes the condition; and if the proviso is void for want of power, how can the condition which is created by it, be operative to defeat other parts of the law, which have all the requirements of the Constitution to make them laws?

In fact, this precise point we consider was decided by the Supreme Court of Iowa, in the case of *Santo* v. *The State*, 2 Iowa Rep. 205.

In that case a general law was passed.   By the 18th section it was to be submitted to the people; the submission of it was void for want of authority, yet the court decide that only that section was void, but all the balance was in force.

Thus, in regard to acts of the legislature which involve a mere question of authority, the condition or contingency annexed to them is wholly different from the vesting or divesting an estate.   If they have authority to pass a law, and do so with all the formalities required by the Constitution, the law is valid; if they annexed a proviso or section declaring them to be inoperative until a certain thing is done, and if they have no legislative power to pass the proviso, it is a nullity, and the previous parts of the law being absolute and constitutional, take effect.

3.   Another objection is, that the taxes are moneys of the State, and could not be withdrawn or appropriated without a vote of two-thirds of the legislature.   The constitutional provision was only intended to apply to moneys collected by the State for State purposes, and paid into the treasury.

These belonged to the State at large; but taxes imposed for local purposes, on counties, towns, or districts, and applied to special local purposes, never was the money of the State, although levied in the name of the State.   This hardly needs argument.

*W. P. Harris*, for appellees.

These cases arose under the Act of 1858, called the "Levee

law." The appellants, Hamer and Hill, owners of land in that part of Yazoo county embraced in the limits of the tract of country described in the act, filed their bills in the Chancery Court of that county, to enjoin the collection of the tax provided for in the act, and the object in each case was to test its validity. The bill filed by Hamer states, that he is the owner of certain lands in the tract of country comprehended in the act. That an election was held in accordance with the directions contained in the 1st and 29th sections of said act, which resulted in the election by the legal voters of the proposition to tax; and that the sheriff, regarding the action of the voters as giving validity to his proceedings, is about to enforce the collection of the tax. The bill refers to the provisions of the act, and alleges that it is void, because repugnant to the principles of the Constitution. We content ourselves with extracting the 1st and 29th sections of the act referred to, as bearing directly upon the principal question involved, and with a brief summary of the other dependent and independent provisions.

The 1st and 29th sections are as follows :

Section 1. Be it enacted, by the Legislature of the State of Mississippi, That there be, and is hereby levied and assessed a uniform tax of ten cents an acre, per annum, on each and every acre of land in this State lying east of the Mississippi river, and north of the southern line of Issaquena county, west of the Yazoo and Tallahatchie rivers to the confluence of Tallahatchie and Cold Water rivers ; thence north and west of Little Tallahatchie to the mouth of McIver's creek, in the county of Panola ; thence north with the base of the hill skirting the bottom in the counties of Panola, Tunica, and De Soto, to Horne lake ; thence west, meandering with said lake, and the pass of the same, to the Mississippi river, except lands held by the State in trust or otherwise, and school lands now exempt from taxation ; which tax shall be continued for the period of five years, and shall be payable annually on or before the 1st day of April in each and every year, from the 1st of April 1859, to the 1st of April, 1863, inclusive. Provided, that this, act shall not be construed so as to embrace any of the Chickasaw school lands, while the same are held in trust by the State. Nor shall it embrace any land known as hill land in the county of De Soto, but said Chickasaw school land shall be taxed as soon as sold,

and said hill land shall be altogether exempt.   Provided further, that all lands lying in the county of Panola, between the foot of the hills and the highest known flood line of the Mississippi river, shall be exempt from the operations of this act.   But no such land shall be exempt unless the owner or owners, his or her agent, shall' make and file, with the probate clerk of said county, an affidavit setting forth said land by its numbers, and positively stating that the same is above the flood-line of the Mississippi river.   Provided, however, that the said tax proposed to be levied and collected in the said counties of De Soto, Tunica, Coahoma, Bolivar, Washington, Issaquena, Yazoo, Sunflower, Tallahatchie, and Panola, shall first be submitted to the legal voters in the district of country proposed to be taxed, on the 1st Monday in January, 1859, which said election shall be conducted in the same manner and upon the same notice as other elections; and if a majority of the legal voters residing in the district of country proposed to be taxed, vote against the said tax, then the same shall not be levied or collected. .

Section 29.  Be it further enacted, That it shall be the duty of the governor of this State, as soon as this bill is passed and become a law, to issue his proclamation to the sheriffs of the counties in which the lands taxed in this act are situated, to hold an election as provided for in the first section of the bill; and the question voted for shall be tax or no tax; and on failure of an election being held in any of said counties, then the votes given in the counties in which elections may be held, shall be taken as the sense of the legal voters of the district embraced in this act, as provided in said first section.

The act provides for the appointment of certain commissioners by the boards of police in the counties named in the act, limiting their choice to citizens of those counties.   These commissioners are to elect a president, secretary, and treasurer, and thus organized are called the board of levee commissioners.   They are to hold meetings at stated times, and administer the funds collected for the levee, and superintend its construction, repairs, &c., with capacity to contract, sue, and be sued, and have the "power of a body corporate to carry out" the objects indicated.

The tax mentioned in the 1st section, is to be collected by the sheriffs of the counties named in the act; and they are to give bond

for the faithful collection and payment of the taxes, payable to the State of Mississippi, which bond is to be given on or before the first Monday of January, 1859. The moneys collected from the counties of De Soto, Panola, Tallahatchie, Sunflower, and Yazoo, are to be paid to the treasurer of the board of levee commissioners, to be employed in the construction of a levee in front of the counties of Washington, Issaquena, Tunica, Coahoma, and Bolivar; while the moneys collected under the act in the last-mentioned counties, for three years, are to be paid to officers authorized to receive the same in the counties, and to be devoted to the payment of the levee debts of those counties incurred under former laws, applicable to them; after which time the levee funds of the entire district of country are to be consolidated and expended under the direction of the board of levee commissioners.

There is an independent provision for the counties last above named, authorizing the boards of police to levy a tax to a certain amount over and above the tax mentioned in the first section, to be expended on the levee in those counties, to which no condition is annexed. The president of the board is required to make report to the legislature of the proceedings of the board, &c., &c.

The bill filed by Hill, contains specifications of the objections to the enforcement of the tax:

1st. That the measure, as it came from the legislature, was merely a direction to submit a proposition to the legal voters, whether or not a tax should be levied, and therefore derives its authority alone from the will of the voters.

2d. The act is, in effect, an appropriation of money out of the treasury, for objects of internal improvement, and was not passed by a majority of two-thirds of both houses, as the Constitution requires.

3d. That it is an act by which the people of one county are taxed to pay the debts incurred by other counties; or if not of this character, it is an act by which the people of one county are taxed for a local improvement in other counties, and the people of those counties immediately concerned in the improvement, exempted from the like burden.

4th. That notice of the election was not given, as required in the 1st section of the act.

5th. The act arbitrarily selects certain portions of the lands supposed to be subject to overflow, and leaves out other lands equally liable, in order to secure its adoption by the voters.

It is conceded that an election was held on the first Monday in January, 1859, and that a majority of the votes cast in the district were in favor of the proposition to tax.  The bills make the persons officially connected with the collection and disbursement of the tax, defendants.  The defendants filed general demurrers to the bills, and the court below overruled the demurrers, and from this action of the court below the defendants appealed to this court.

The first step in this investigation, is to determine the precise character of this enactment by a careful consideration of its features :

1st. The district of country proposed to be "taxed," is not one of the local divisions recognized by the Constitution, or established by law, nor is it formed by the union or aggregation of two or more towns, townships, or counties.  It embraces counties and parts of counties, without reference to county lines.  The legal voters or qualified electors resident in "the district of country proposed to be taxed," are not therefore connected with each other as the constituent members of a local municipal body or quasi corporation ; their only connection being that which exists amongst the persons comprising the body of qualified electors in the State of Mississippi, defined in 1st Section, 2d Article of the Constitution, and their power as such under the government is limited solely, as one of the constituent elements of the political organization, to the election of the officers of the government.

The inhabitants of the district of country are not connected with each other, otherwise than as inhabitants of the same State ; and the land-owners consist of persons living in other States, and in different parts of this State, and not connected with each other in any way, except that they all own lands in the tract of country described.

It was not the design of the legislature in adopting this measure to vest power in city or county authorities to raise revenue for local purposes, on the condition that they should first obtain the assent of a majority of the constituent members of the local body politic.

There is not the least pretence that the object or effect of the

measure is to provide for the action of a body of corporators in reference to the affairs of the corporation, which bodies, on the principles of the common law, act by majorities to bind the whole.

It was not the purpose of the act to obtain the consent or to make the tax dependent on the will of the majority of the owners of the lands proposed to be taxed, and who are supposed to be benefited by the levee. The proposition does not profess, and really was not designed to obtain the consent of the proprietors of the lands.

It was well known by the legislature that "legal voters" or "qualified electors" are defined by the Constitution, and that the ownership of lands or other property is not among the required qualifications of the persons composing that body. The qualified electors are adult male citizens of the State and county, and in submitting the proposition of a forced contribution from land-owners to the qualified electors of the district of country in which the lands lie, minors, female owners, and non-resident owners were necessarily excluded; and this proposition submitted to the decision of a body of persons, a majority of whom, according to our knowledge and observation, do not own land, and many of whom do not own property of any kind.

Every planter has one or more overseers who do not own land, and yet who reside in the district, and are competent to vote. Many of the land-owners do not reside in the State, very many reside out of the district, and very many who reside in the district are women and minors.

The proposition, therefore, as it came from the legislature, was to submit the question of a specific tax on lands to the decision of the majority of a body of persons known to the Constitution and laws of the country as "qualified electors" only, and as such having no power in or out of the district of country, to bind the minority or the community in any matter save in the election of officers in a representative government.

The measure, or enactment, such as it is, was not designed to affect a corporation or subordinate municipal body through the vote of a majority of its constituent members, nor does it belong to that class of measures which provides for the assessment of the expense of local improvements on the property benefited, with the assent of a majority of the proprietors of the property.

So far, therefore, as the act depends on the action of the legal voters, it depends on a body of persons having no power over the subject derived from the Constitution, or from their relations to the subject of the tax, or the improvement, or to each other ; and so far as they have power over the statute, it is imparted by the legislature, which with equal propriety might submit the question to any one or more of any class of persons in the district or State.

It is apparent that the measure approved on the 2d day of December, 1858, was not the expression of the legislative will, that the tax should be levied, but merely an expression of the legislative will that a majority of the qualified electors resident in the district of country proposed to be taxed, should decide upon the propriety and expediency of the tax, and say whether it should or should not be levied.   If the measure was complete when it received the signature of the governor, it was complete as a mere proposition to be thereafter adopted or rejected.   It was as much the legislative will that the tax should not be levied, as it was the legislative will that it should be levied.   That will, so far as it affected the tax, would be subserved as well if the majority of legal voters should oppose the tax, as if that majority should approve it.   This is indisputably true, and demonstrates the proposition that the legislature expressed no will, one way or the other, and designed to substitute the will of the majority of the voters as the vital principle of the enactment.

The governor is directed to call the electors together by proclamation, on the 1st Monday in January, 1859, within one month after the bill was signed, to carry out the provision or direction in the first section of the act, that the "tax proposed to be levied" shall first be submitted to the legal voters.   The "sense" of the legal voters was first to be taken on the question "tax or no tax ;" and prior to this submission it was not final as an assessment ; and whether it should be levied and collected was made to depend upon the result of the vote on the question of "tax or no tax," to be ascertained by a comparison of the numbers voting in the affirmative with the number voting in the negative.   This is rendered positively certain by the terms of the enactment, in spite of the transparent effort to conceal the purpose to make the measure absolutely dependent for its character as law on the will of the qualified electors.

The provisions bearing on this point are contained in the 1st and 29th sections of the act, and are here extracted:

"Be it enacted, that there be and is hereby levied and assessed a uniform tax, . . . provided, however, that said tax proposed to be levied and collected shall first be submitted to the legal voters in the district proposed to be taxed, which said election shall be held on the first Monday of January, 1859." "It shall be the duty of the governor to issue his proclamation, &c., to hold an election as provided for in the first section of this bill, and the question voted for shall be 'tax or no tax.' . . . . The votes given in the counties in which elections may be held shall be taken as the sense of the legal voters of the district embraced in this act, . . . . and if a majority of the legal voters residing in the district of country proposed to be taxed, vote against said tax, then the same shall not be levied or collected."

In submitting the question "tax or no tax," and taking the "sense" of the legal voters, who are to elect one or the other of the propositions, "tax or no tax," by ballot, the legislature has, in substance, in form, and effect declared, that this proposal shall be law or not law, tax or no tax, as the majority may elect. This majority was not to be a majority of the voters qualified to vote in the district, because there was no means of ascertaining the number of legal voters on the first Monday of January, 1859. It was to be a majority of those voting, to be ascertained by comparison of the affirmative votes with the negative votes. "The majority of legal voters residing in the district," means a majority of those entitled to vote and voting at the election. Residence in the district is merely one qualification which the voter must have.

It is impossible to misunderstand these provisions. It is true the legislature have not said, in so many words, that the first section shall not be law until it is approved by a majority of the legal voters; but this is the plain legal effect of the provision, and the manifest intent and meaning of the legislature. They have said plainly, to the majority, "Thy will, and not ours, be done in this matter." No well-ordered mind can be misled by the supposed distinction, which, by a subtle refinement, is sometimes attempted to be drawn between that which is to be first submitted to the legal voters, to ascertain whether a majority are opposed to it, and to be

void if such majority are found opposed to it; and that which is only to be law, provided it shall be submitted to the legal voters, and a majority shall be found to approve it.

There is no such distinction.   Nor is there any distinction in substance between a revenue bill, which is to be law or not law, according to the decision of legal voters, and a revenue bill under which the tax levied is to be enforced or not, according to the will of that majority.

Neither is there the slightest difference in principle between giving authority directly to the voters to impart vitality to an act, and to make it a law by express terms, and the giving such effect to their votes, that the measure is to have an existence, or be a nullity, according to the number of ballots which may be cast for or against it.

It is wretched drivelling to attempt to screen the act under such subtleties.

The question of "tax or no tax" was directed to be submitted to the legal voters at an election.   The term election, in the act, implies a choice, by voters having power to choose, either to accept or reject the tax.   If the majority vote tax, it is accepted, and the tax is to be collected; if a majority vote or elect "no tax," it is rejected, and the tax is not to be collected.

It cannot be disguised that the legislature did make, and intended to make the will of the majority operate instead of their own.   Their will was that another will should determine whether a tax should be levied or not.   The final fiat to tax the lands in the district of country did not emanate from the will of the legislature, which was neither for it nor against it.   The legislative will alone could determine whether it should or should not be levied; and when the measure left that body, it lacked the constitutional stamp of authority; for it could not be said when the bill was signed by the governor that it was his will, or the will of the government that the lands should be taxed.   It was the will of the governing power that it should be levied, or that it should not be levied, as might be determined at the ballot-box.

It matters not whether we express the idea by one form of words or another; whether we say the legislature declined to express that will which alone can make law under the Constitution, or that the

legislature gave authority to the body of legal voters to act on a proposition submitted, the complexion of which was to be taken solely from the majority voting, the result is the same. In the one case, it has not the authority of legislative will, which is not communicated; in the other view, the legislature associates the legal voters in the passage of laws.

The legislature digested and framed a measure, and so far as framing the measure goes, it was complete; but complete only as the measures digested and framed by the four hundred of Athens, and the council of elders or the Ephori of Sparta were complete; that is, they were ready to be submitted for that action of the assemblies of the people which was to give or deny to them the authority of laws. The legislature framed a proposition, or measure. The governor is to call an assembly of the people by proclamation (for the election is nothing more), the measure or proposition to tax is to be submitted to this assembly for acceptance or rejection, and their decision is to be final. It is idle to cavil about the difference between an act which begins, "Be it enacted, that this shall be law, provided on its submission to the legal voters, a majority of them do not vote against it," and an act which begins, "Be it enacted, that a tax be levied, provided, however, before it is levied an assembly of the people be called, and if a majority vote tax, then it shall be collected; but if a majority vote no tax, then it shall not be collected." In substance this is a decision on the expediency of the law, for we cannot separate the tax from the law; and in both cases the legislature associates the legal voters with them in the final passage of the law on the same terms that the people were associated with the council of the four hundred in Athens. It is submitting the pockets and the property of the citizen to the arbitrary will of persons who have no right to bind them. We cannot screen this measure under the pretext that it was a self-imposed tax,—the voters and tax-payers are two distinct classes. Neither can it be said it was a selection of superior skill or intelligence. Nor that the overflow is in any manner dependent on the disposition of legal voters, although the legislature is.

The legislature had before them the proposition, shall we tax the land-owners of this district of country to raise a fund for the levee? Is it expedient and proper? We will not decide it, say they, but

we will refer it to the legal voters; and they accordingly referred it to them, a body of persons having no power to bind these land-owners by their acceptance or rejection.    Such is the character of the Act of 1858.

The system of government to which we assented in forming the organic law, puts life, liberty, and property under the control of a responsible representative government, and protects them from the capricious action of irresponsible "legal voters."    If the Constitution is obligatory, it excludes every mode of governmental action, save that which it prescribes.    We rejected monarchy.    We rejected the democratic forms which, according to the information our ancestors had of them, were best illustrated in that of the Athenian people, where one body of chosen citizens framed measures, which were to be submitted to the people, and accepted or rejected by them.    The people could not alter or originate any measure.

Our Constitution explicitly negatives any mode of legislation, any mode of governmental action which associates the people or any other agencies in them than those prescribed in the Constitution.    The legislature cannot associate any other agent in the chief executive function, save the governor, nor any other agents in the judicial function, save the judges; and the same principle forbids that body from associating with themselves any other agency in the enactment of laws.    To admit such a power, is to admit the power to disorganize the government, and to change its form.    The frame and structure of the government, its essential character, its modes of action, as prescribed in the Constitution, are as obligatory on its several departments, as a mandate or prohibition expressed in words. In this respect it differs from the constitutions of other nations, which are not obligatory, and which merely influence, but do not absolutely control the government, and it differs moreover in the admirable arrangement by which acts and measures, contrary to its spirit and principles, are held void, and rendered ineffectual through the action of the judiciary.

It would be monstrous to hold that, although, according to the frame of the government, the body of "qualified electors" are vested with power to choose the officers of the representative government, and no other power, and the legislative body vested

with legislative power exclusively,—that this character of the government is not obligatory, because the Constitution has not declared that the legislature shall not blend the two into a law-making power.   If this were so, then our form of government is illusory. Clearly, the structure of our government is without vigor or vitality, if the legislature may modify or control it.   If there is anything perfectly self-evident, it is that the structure and essential nature of the government forbids the association of the body of qualified electors, an irresponsible body, in the law-making power, and confines the power to determine the expediency of laws to a body of responsible representatives, acting under an oath, and subject to render an account to their constituents.

The judiciary would fail to perform its appropriate function if it did not interpose to arrest a tendency to disorganize the government, to modify its essential character.

Those who have attempted to sustain this kind of legislation, rely upon the proposition that the legislature has all power not expressly prohibited and not confided elsewhere, and to enforce this view they illustrate it by the distinction between the Federal Congress, which has no power not specially granted, and the State legislature, which has all power not taken away.   In the first place, the question is not how much power the legislature has.   We are contending that the power it possesses belongs to it exclusively.   But the proposition is too broad, unless we agree that a prohibition may result from the very nature of the government.   Besides, the distinction is wholly inapplicable to the present question ; for the principle for which we contend is applicable to both Federal and State legislature. The State legislature derives the power it possesses from a grant in the Constitution, and the Congress from a grant in the Federal Constitution.   The difference lies in the terms of the grant.   The State Constitution gives all legislative power, by which is meant power over all legitimate and rightful subjects of legislation, while the Federal Constitution gives legislative power over certain enumerated subjects.   The State legislative power extends to many subjects, while that of Congress extends to a few subjects ; but legislative power over a given subject is the same under both constitutions.   Judicial power is the same under both constitutions and determined by the same rules, but in the one case it can be exer-

cised only in a few cases.    The manner of its exercise is the same and determined by the same rule in the one case as in the other.    We would assert with confidence that Congress could not exercise judicial power, not because that power is not granted in the Constitution, but because that power is confided elsewhere, and the structure of the government forbids it.

The same result is produced under State constitutions, even without the language of ours, which out of abundant caution has declared the separation of the three functions of government, and forbid the blending of them in the same hands.    The partition of power under the American system is exclusive, with certain declared exceptions, and obligatory on all the departments.

If Congress should submit proposed laws to the ratification of the constituency of the Senate or the House, or of the executive, no one would hesitate to declare the act a violation of the fundamental law—a complete perversion of the governmental power; not because the power to do it is not expressly granted, but because legislative power is given exclusively to the Senate and House of Representatives.    These constituencies have defined powers pointing to well-defined objects; and, according to the structure of the government, have no power in the government beyond that of electing the officers to carry it on.

The legislative power of the State, however ample as to the subjects which it embraces, is, nevertheless, granted exclusively to the Senate and House, and the mode of its exercise prescribed; and this mode must be pursued to the exclusion of all other modes. This power is like the legislative power of Congress in a given case : however absolute over the particular subject to which it may be applied, it is limited by the principles which enter into the structure of the government.    Every one will admit that a government, State or National, which, by its constitution, should make it obligatory on the legislature to submit the laws to the constituencies of the government for ratification, would be radically different from ours.    Indeed, no rational man would consent to such a form of government.    Shall it be said that, nevertheless, the legislature may, in its discretion, adopt such a system in practice ?  Mr. Madison congratulated his countrymen on their choice of representa-

tive instead of a democratic government, but he was deceived if such an act as the one under consideration is admitted to be valid.

The body of "qualified electors" under the Constitution exercise one function in the scheme of government. They elect the officers. This was confided to them as their best security against bad government. It is their charter of political liberty. But it was conceded by the most liberal and wisest of those who framed our system, that they were unfit to be intrusted with legislative power, not because of the inconvenience, for nothing is easier than to call an election, but because of the danger of anarchy and the utter insecurity of life and property in the hands of an unreflecting, irresponsible majority. If we took this power from them, can it be returned to them in any case where the legislature undertakes to act under that clause of the Constitution which says, " All legislative power shall be vested in the Senate and House of Representatives."

If it were not sufficient to show that legislative acts made to depend for their final sanction upon a vote of the people, violate the representative principle in our American system of government, it would be easy to show that one important feature in the government, as established by the Constitution of Mississippi, is practically subverted by the principle of the Act of 1858. The counties which existed at the formation of the Constitution are perpetuated by it, and provision is made for the creation of new counties. These counties, without regard to population or the number of legal voters, are entitled to one representative in the legislature at least. The number of representatives is restricted to one hundred, and according to this arrangement it is easy to appreciate the value of this feature in our representative system. The members of the legislature are not chosen by the people at large, but by the counties. If the legislature should adopt the practice of submitting laws to the qualified electors at large in the whole State, the influence of counties in the government, in the enactment of laws, would be destroyed, and we would be governed on a principle directly at war with the Constitution. The peculiar representative system in this State would be overthrown by a practical consolidation of the people of the State. What is true of a law applicable to the whole State, is true of a law applicable to a number of counties embraced in an

act, which consolidates them by submitting a law to the legal voters at large in the counties thus blended together.

This is said to be a government in which the majority rules, but in neither branch of the legislative body does the body of qualified electors at large have any representative.   The legislature represents majorities of local constituencies.   If it were proposed to elect members of the legislature by the State at large, every one would see in the proposition a radical change in the structure of the government; nor would this change be less perceptible in the proposition that the final adoption of laws shall be by the voters at large.   We would appreciate this readily if a revenue or territorial law was to be ratified or rejected by the vote of the people of the United States.   The principle of county representation is as firmly fixed in the government of Mississippi, as is the principle of State representation in the Federal Government.   The territorial representation would be of little weight if the small counties could be blended with large ones in voting on the adoption of laws.   Instances might be cited where three small counties, having together a representation in the House of Representatives equal to that of Hinds county, might be over-balanced by the latter if consolidated with it in taking the popular vote.   It would be a violation of the Constitution to blend these counties in electing members of the legislature.   A case of this kind occurred in Massachusetts.   A town, having the right to elect a member of legislature, was blended, by act of the legislature, with a county, so that without diminishing the number of representatives from the town and county, they were, nevertheless, all elected by the district at large.   It was decided that the act was a violation of the Constitution, as it destroyed the town representation.   It would be idle to preserve the feature of territorial representation, if the action of the representative body is made subject to the popular vote, which neutralizes its influence.

The question presented in this case has been much discussed in the courts of the United States during the last ten years.   As a judicial question, it must be considered as settled by the weight of reason and authority, that an act which is to be law or not law, as voters may decide at the ballot-box, is void, because the will of the legislature not being expressed one way or the other, and the question of the expediency of its passage being submitted to a body

not authorized to determine it, and having no constitutional authority to bind the minority, is without authority, and therefore void.

It will be found, we think, that the difficulty does not lie in any diversity in the decisions, as to the correctness of the general proposition above stated, but in determining when a legislative act falls within the terms of the proposition, and the supposed exceptions to the general rule, and the principle of those exceptions.

We propose to notice the decisions touching the subject in detail, and to endeavor to extract from them the true rule so far as it may depend on the authority of decided cases.

The case of *Parker* v. *The Commonwealth*, 6 Barr, Penn. 515, is, in point of time, the leading case in the proposition. There was a general law in Pennsylvania allowing the sale of spirituous liquors on license. The legislature passed an act providing for an election to be held to determine whether this law shall be continued in force. In those counties in which the majority shall vote for license, license shall be granted as heretofore, but in those counties in which the majority vote no license, the sale of liquor shall be absolutely prohibited and punished as a crime. This law was declared to be unconstitutional.

This case was followed by the case of *Rice* v. *Foster*, 4 Harrington, 479, in Delaware. There was a general law of that State allowing the sale of liquors on license. An act was passed similar in its provisions to that which was under consideration in *Parker* v. *Commonwealth*, before noticed. The court held the act to be unconstitutional. The case is important, because the whole subject was attentively considered by the judges, and because the court notices a well-defined distinction between the act then under consideration and the instances in which the legislature creates a corporation or subordinate agencies in local government for special purposes and confers power on them, or is dealing with corporations and providing for the assent of corporators. The court cited the case of *Stewart* v. *Jefferson*, 3 Harrington, 335, arising on the free school law of that State. In the case of the *People* v. *Reynolds*, 5 Gilman, 1, Illinois, and the case of *Bull et al.* v. *Read et al.*, 13 Grattan, 78, questioning the authority of *Rice* v. *Foster*, the courts deny the existence of any substantial distinction between the free-

school law and the liquor law of Delaware.  We think they did not examine the free-school law.  It is to be found in the Delaware Code of 1829, p. 491, and the Code of 1853.  The law provides that certain commissioners shall divide the counties into school districts, and that each district shall be a corporation, with certain powers therein conferred.  The governing power in these corporations was given to a class of persons called school-voters, residents of the district, and required to possess the qualifications of electors for members of the legislature.  This body was required to hold annual meetings for the transaction of business of the corporation. They were to elect a clerk, who was to keep a record of their proceedings, and three commissioners to superintend the preparation of school-houses, &c.  They were authorized to hold special meetings.  There existed in Delaware a general school-fund, and the law provided that this fund should be distributed to the several districts on condition that the district would raise, by donation or subscription, an equal sum ; or, in other words, that the district, on raising a certain amount, should be entitled to a certain sum from the fund, and the fund was to be distributed on that condition. The determination of the question, whether the district would accept the donation, and how much they would raise, was left to the school-voters, and it must appear by the record that a majority were present at the meeting at which the resolution was taken. Subsequently, this law was so altered as to empower the school-voters to decide whether the sum should be raised by taxation or subscription.  In the one case, a general law of the State is to be repealed by the action of the people at the ballot-box, and another law enacted.  The legislature does not repeal the general law, but distinctly leaves the question of its continuance as law, and the establishment of a different law, entirely to the will of a majority of voters.  In the other case, the legislative will expressed in a law providing for the creation of school districts, and their management, vests the power in a body of persons and constitutes the district a corporation, and makes a donation of money to the corporation, on conditions, and leaves the acceptance of the gift to the local government, and provides the means by which those conditions may be complied with, and as one means authorizes the levy of a tax on the corporators or school-voters, the consent of a majority of them being

first obtained.   The difference will be more readily perceived by supposing an act passed in this State, providing for an election, to determine, by ballot, whether the law against banking shall be repealed and free banking allowed, and an act donating a sum of money to support the free school at the city of Jackson, provided the corporation shall raise a sum equal to the donation, and empowering the city government to raise the sum by a tax on the corporators, provided a majority of them shall first signify their acceptance of the grant on the terms stated.   The judge in the Virginia court is likewise unable to perceive any distinction between a law passed by the legislature, after first, through an election, ascertaining the sense of the people, and the framing of a measure by the legislature, to be submitted for ratification or rejection to the people, without further action by the legislature.   In the one case the legislature, being assured that it will be sustained by the popular approbation, proceeds to declare a definite will and enacts a positive law, complete and absolute in its character ; but being, in the other case, uncertain whether the measure will be popular, declines to express its own will, and thus leaves the act without any authoritative stamp, and substitutes the will of the people, which becomes the law-making power.   A court which is unable to appreciate these distinctions, is not a safe guide on a question like the present.

In New York, the common school law of that State was submitted for ratification or rejection to the people, and the measure, by the terms of the act, was to be law or no law, as the majority of the voters might determine.   The Supreme Court, in *Thorne* v. *Cramer*, and in *Bradly* v. *Baxter*, 15 Barbour, decided the act to be unconstitutional.   A contrary decision, however, was made in *Johnson* v. *Rich*, 9 Barb. 680.   The question was carried to the Court of Appeals, and in *Barto* v. *Himrod*, 4 Selden, 483, a review of the previous decisions resulted in a decision against the validity of the law, because of the substitution of the will of the people for that of the constitutional law-making power.

In Indiana, in the case of *Maize* v. *The State*, 4 Ind. 342, and in Iowa, *Gabreck* v. *The State*, 5 Iowa, 491, liquor laws, substantially the same as those in Delaware and Pennsylvania, were held to be void, and for the same reasons.

Sedgwick, in his Commentaries on Statute and Constitutional Law, treats the question as judicially settled in the United States, that a measure depending for its efficacy purely on the consent of the people, expressed at the ballot-box, lacks the force of law. Sedgwick on Constitutional and Statute Law, 165, 177.

Sedgwick, quoting the New York cases, states his fundamental proposition thus: " A law must receive its final sanction from the legislature, and the trust of the popular representative cannot be returned to the people, nor delegated to any other power."

The cases thought to be opposed to this array of authorities are, *The People* v. *Reynolds*, 5 Gilman, Illinois, 1, which was a proposition to divide a county and to erect a new county, and the question of the erection of a new county left to the decision of the voters of the county. The law was held to be valid.

The case of *Beercroft* v. *Dumas*, 21 Vermont, 466, which was a law authorizing certain commissioners in counties to grant license to sell liquor, but requiring the assent of a majority of voters, or heads of families, as a condition on which the license was to be granted, to be ascertained by vote. In this case, the court did not question the decisions in Pennsylvania and Delaware, but drew a distinction between the laws, holding that the Vermont law was a complete and perfect act, giving power to commissioners of counties, but annexing a condition to its exercise. The Vermont law established a permanent rule by which license to retail should be obtained, and there was to be a meeting of the county voters annually. The law was declared valid.

In Ohio, the *C. W. & Z. Railroad Company* v. *Clinton County*, 1 Ohio State Reps. 76, a case arising on the law of that State, authorizing the county of Clinton to subscribe for stock in a railway, annexing as a condition to the subscription, that a majority of the voters of the county should accept the grant or approve the subscription. The court expressly recognize the correctness of the decisions in New York, Delaware, and Pennsylvania, but treat the act in Ohio as a grant to a municipal body, and an acceptance by that body of a grant of power or privilege, to be exercised on a condition, and, therefore, a complete and valid act.

The case of *Slack* v. *Maysville and Lexington Railroad;* a like case in Kentucky. The act was sustained over a dissenting opinion

by Hise, J., 13 B. Monroe, 1; *McQuillen's Heirs* v. *Lexington*, 9 Dana, 514, the charter of the city providing that the city council, on petition of those owning the largest amount of property in any square, should cause the streets adjoining to be paved and graded, &c., and assess the expense on property owners. The court held this to be a valid grant of power, and that the act created the proprietors of the squares a body politic,—a local public for the specific purpose,—in which the proprietors were corporators, and competent, by act of the majority, to bind the whole. The same doctrine held in *Hyatt* v. *Louisville*, 2 B. Monroe, 177.

In *Corning* v. *Green*, 23 Barb. 23, the court decided that the act establishing a harbor at Albany, and containing many provisions affecting the city, and which provided that said act should cease, unless the corporation should accept it in sixty days. The act was sustained. In *Clark* v. *City of Rochester*, 24 Barb. 472, the court sustained an act authorizing city authorities to subscribe for stock, on the vote of a majority of the city electors. The court recognizes the soundness of the decision on the common school law of New York, but said this case is entirely different. It is an act affecting the internal affairs of a city. That the inhabitants are the corporators, and of right might accept or reject the grant, and that a law passed investing the city government with power to contract for stock, on condition of the sanction of the corporators, was valid. Page 473. A complete law, depending, as laws affecting corporations, may be made to depend on the assent of the corporators.

In the case of *Bank of Rome* v. *Village of Rome*, decided by the Court of Appeals, reaffirming *Barto* v. *Himrod*, 18 N. Y. Rep., the same law in principle held to be valid.

In Pennsylvania, laws have been sanctioned which refer the erection of new school districts, which are corporations, to the voters of the district, or to the Court of Quarter Sessions. *Commonwealth* v. *Judges*, 8 Barr; *Commonwealth* v. *Painter*, 10 Ib.

Bell, the judge who decided the case of *Parker* v. *Commonwealth*, says, that acts providing for the laying off of new school districts are to be distinguished from laws affecting the lives and property, the civil and political rights of the citizens, and likens the former to acts for laying off roads, erecting bridges, and selecting county sites,

when local knowledge is enlisted by the legislature. He says the distinction is so palpable that it would be "a waste of words to show the contrast."

In Virginia, the case of *Bull et al.* v. *Read et al.* 13 Grattan, 78, an act to constitute a new school district, and provide for its government, was submitted to the voters of the district for acceptance (the district is made a corporation), and was held to be valid.

In Tennessee, 1 Sneed, 689, the case of an act granting power to county authorities to subscribe for railroad stock, on condition that a majority of the voters of the county approve the subscription. In this case, the court questions the authority of the cases in New York and elsewhere, declaring acts invalid which depend for their character as law upon popular suffrage, on the ground mainly that the legislature possesses all power not granted to the other departments, and not prohibited, but says that the act is valid on other grounds,—that it is a complete act conferring power on the county government, and when that government levies the tax, it is absolute, and comes from competent authority, although that authority had first consulted the will of the voters, &c.

A like case in 25 Ala. 618, where such a law is pronounced valid. The court in this case does not dispute the authority of the cases cited in support of the proposition that the voters cannot determine the expediency of a law, and accept or reject it, but draws a clear distinction between such acts and the one under consideration, which is a grant of power to a corporation on condition.

The case of *The People* v. *Collins,* in 3 Michigan Rep., 343, where the eight judges were equally divided in opinion as to the validity of a law of that State, made to depend on the popular vote as to whether it should take effect in 1850 or in 1870,—a liquor law. This was an attempt to evade the doctrine of the courts,—for to postpone the act until 1870, was understood to be a defeat of the law by popular vote.

If we have omitted any cases, it is because we have not found them in our examination, or they belong to a class of which one or two examples have been cited. *Johnson* v. *Rich,* 9 Barb. 680, an overruled case, sustains the school law, pronounced unconstitutional in New York, and is the only case in existence, so far as we know, which is in conflict with the cases of *Parker* v. *Commonwealth,* and other cases in that line of precedents.

*The State* v. *Copeland*, 3 Rhode Island Rep. 33, and the case of *The State* v. *Parker*, 3 Deane (26 Vermont), 357, are cases which expressly sanction the doctrine of *Rice* v. *Foster*, as to the power of the people to put a law in force by a vote of the majority, but the latter seems to support the idea that a law may be suspended or repealed by the people at the ballot-box, a distinction which is without the slightest foundation.   The people have no more power to repeal than they have to enact laws; and there is no difference in principle between the legislative power to repeal laws, and the power to enact them.   But there is this important difference in the effect of a proviso, or independent enactment authorizing the voters to repeal a law in existence, and a proviso or enactment authorizing them to enact a law.   In the former case, the proviso may be treated as a nullity, as it clearly is, but in the other case it is a condition precedent upon which the act is dependent, and to hold the proviso void is to destroy the dependent act.   It will be confessed by any impartial mind, in reviewing the decisions, that there has been a strong disposition in some of the courts to support these popular enactments by subtle refinements, and to hold the provision for submission to the people to be a subsequent condition which may accomplish the object of consulting the popular will, and at the same time not affect the validity of the law in the courts, which hold that a void proviso in the nature of a condition subsequent may be rejected, and leave the act to stand, and legislatures acting on the same motive have contrived by mere tricks in phraseology to leave laws to depend on the popular will, and at the same time furnish the pretext for the courts to uphold them.   Nothing is more conspicuous than these efforts, judicial and legislative, and it furnishes one of the most striking and melancholy proofs of the progress of ideas destined to change the character of our constitutional system of government, and of the frail tenure by which we retain its most essential principles against the powerful influence which the popular element has acquired in America within the last ten years.   The general proposition that voters cannot make or unmake laws, is so manifestly true, that few have the hardihood to dispute it; and yet judges and legislators have set to work deliberately to invent a phraseology, by which they cheat the people and cheat their own understandings.   They seem to have commenced, as Voltaire says

of Mahomet, " to impose on mankind, and ended by imposing on himself." This matter of conditions subsequent will be noticed in its proper connection.

The cases which are here presented as the cases relied on to qualify, or to impugn the doctrine of *Rice* v. *Foster*, and others of that class, are characterized by one feature which distinguishes them all. They all relate to corporations, or subordinate local organizations, having power to administer their internal affairs. They may be divided into two classes:

1st. Cases of laws providing for the creation of new counties and school districts, and the like. Of this class are the cases 3 Harrington, 335; 5 Gilman, 1; 13 Grattan, 78; 10 Barr, and 8 Ib., before cited.

2d. Laws conferring powers on existing local municipal bodies, or affecting them, and requiring, in some form, the assent of the corporators; or annexing, as a condition to the exercise of the power, the assent of a majority of the constituency of the local government or organization. Of this class are the cases in 1 Ohio State Rep. 76; 1 B. Monroe, 1; 2 Ib. 77; 9 Dana, 514; 21 Vermont, 406; 1 Sneed, 689; *Bank of Rome* v. *Rome*, 18 N. Y. Rep. (Smith); *Clerk* v. *City of Rochester*, 24 Barb.; and *Corning* v. *Green*, 23 Ib.; 24 Ala. 618.

In some of these cases the courts question the doctrine of *Rice* v. *Foster*; but in a majority of them the principles of that case, and the case of *Parker* v. *The Commonwealth*, and *Barto* v. *Himrod*, are affirmed with approbation. Of this number are cases 21 Vermont, 456; 1 Ohio State Rep. 76; 24 Ala.; the case of *Bank of Rome* v. *Village of Rome*, 24 Barb.

The cases in our own Court of Appeals will be reserved for a separate consideration. It is sufficient to say, that they belong to the second class, as above described.

The conclusion to which we are led by this examination of decided cases is, that an act of the legislature which depends for its effect, as law, upon its acceptance by the people, is void,—a conclusion fortified as well by reasons founded in the theory of our government, as by judicial authority.

There is, however, on the authority of the cases cited, a line of distinction, which separates legislation which is to operate upon an

existing local organization, such as a county, city, or town, or which creates. such local organization, from that which operates upon the people at large, or upon populations not organized or proposed to be organized as the constituency of such local organization.

It is perfectly self-evident, that legal voters who do not occupy towards each other the relation of constituents, of a common local government, have no power to bind the minority by the vote of a majority, in the acceptance of laws.   There is, however, an acknowledged power in the constituent members of municipal corporations established for public purposes, to bind the whole body by the act or vote of the majority, unless the statute has declared a different rule.   This is the sole foundation on which rests the authority of majorities to bind by act or vote the property, or affect the rights of the minority.   The power exists under no other circumstances.   Upon this foundation rests the practice of consulting the will of the majority in the exercise of power by local governments or authorities, in accepting charters or laws of incorporation. We propose to trace the origin of this usage by the legislature, hereafter, and point out its limits.

There can be no controversy about a law applicable to the State at large.   The question we propose to consider just now is, whether the restriction extends only to laws which are general in their nature?   We think it extends to all laws; and if there be an exception in favor of local laws, the exception is confined to such as are local by reason of their application to subordinate local municipal bodies.   There can be no difference between a law applicable to the whole State, and a law applicable to one-half of the State; or to so much of the State as lies east of Pearl river; or to so much of the State as lies north of a particular parallel of latitude, merely because the latter may not operate as to every purpose or object, on the whole State.   Every work of internal improvement must have locality as to situation and a local effect, but may also have a general effect.   A law which imposes a tax on all lands subject to overflow, would not be local, because we might otherwise describe them as lying in a particular part of the State, or by certain boundary lines,—the tax is a charge on the owners, and the owners may be dispersed all over the State.   The boundaries employed in the Act of 1858, are merely part of the description of the subject taxed,

and does not localize the tax, which is a charge upon every man in and out of the limits defined, provided he owns lands of the description mentioned in the act. The purpose of the assessment is to construct a levee in front of certain indicated counties, and in the expenditure, the purpose is thus localized. But the part of the State embraced by these counties, is peculiarly liable to destructive overflows. A large amount of the wealth and taxable resources of the State are centred there, and the State in behalf of its own lands, swamp lands and the like, and on account of its position as a trustee for certain lands donated for schools and other objects, is deeply interested as a whole, in the objects of the tax. The sheriffs give bond to the State of Mississippi for the faithful collection and disbursement of the tax. The auditor of public accounts is made a collector and disbursing agent. The levee superintendent has been declared to be an officer of the State. He is required to make report of his doings to the legislature. The wilful breaking or destruction of the levee is declared a crime, and that part of the act forms part of the criminal code. We confess that our object is not to prove the Act of 1858 to be a general act, because we deem it immaterial whether it conforms to the definition or not. According to Smith's Com. Const. and Stat. Law, p. 421, 422, an act which benefits the property of the State, *i. e.* property belonging to the aggregate body politic, by increasing its value, or which increases the public revenue, is a general act, and it cannot be disputed that the State is the owner of lands affected by the overflow and embraced in the district taxed. A law having such operation and such objects, extracting an enormous revenue from private property, must as certainly be governed by the principles of the Constitution as any other law. Our object is partly to show that if this is a local measure, the claim to have the Constitution respected in its passage is as high as it is in respect to any other law, and partly to show how delicate and perplexing will be the task of the judiciary, if it undertakes to draw the line of distinction, with a view to exempt all local laws from the operation of the 4th section, 3d article of the Constitution.

The court, in *Williams* v. *Cammack*, 27 Miss. R. 223, say: " In point of principle and constitutional power, there is no difference between taxes imposed for a general purpose, and those imposed

for a public local purpose." The power to impose local taxes for purposes exclusively local, results from the power to apportion the burdens of government, and is exercised in all the revenue bills, whether local or general. The power being conferred by the Constitution on the legislature, must be exercised by it; and if that body cannot devolve the power on the people in the one case, it cannot in the other. The government may apportion taxes by the exercise of legislative power, but it is the identical power in the case of local taxation that is exercised when a general tax is imposed.

No rule can be applied to a part of the people living within certain limits arbitrarily fixed by the legislature, which is not applicable to the whole people; and if a general law be void for want of the authoritative stamp of the legislative will, a local law is void for the same reason. It is apparent that we cannot fix, as the limit of the constitutional restriction upon the power to submit laws to the decision of the ballot, laws of a general nature only, when there is nothing in the Constitution to authorize the distinction, and when we are compelled to trace the power to enact local laws, to the same clause which confers power to enact all laws. We must yield the power and admit a discretion in the legislature in any case to associate the qualified electors in the passage of laws, or give up the distinction between general laws and public local laws; and to yield the power "would not be in keeping with the frame and structure of the government, and directly repugnant to the theory of a representative republic," as has been said by the court. 25 Miss. R. 744.

If the principle is of any value—if it has any vigor at all, it extends to all laws, to all legislation, except that which from its nature requires the consent of those upon whom it is to operate, or in which long-established usage has made such consent a proper ingredient. The authorities we have cited, and sound principle, both conspire to render this distinction the only basis of a consistent rule on this important subject. The attempts to go beyond this line commenced about ten or twelve years ago, about the time we began to feel the influence imparted to the popular element in our American system, by the extension of the elective franchise, and by making all offices elective. Up to that time the practice of

referring laws to the people for acceptance, was confined to acts of incorporation and acts establishing subordinate municipal bodies for the regulation of local affairs. It had its origin in the rule of the common law, that in public municipal corporations for public local purposes, if there be no other rule established by statute, the majority of the corporators or of the constituency of the local government, have power to bind the whole by the acceptance of a law, or grant, and in measures affecting the corporators. The idea of devolving the law-making power, or the power of accepting or rejecting laws upon the people at large, or upon people having no relation to each other from which such power results, had then and has now no footing in jurisprudence, being without support in the principle of our system of government, or in well-considered judicial opinions. In the case of *Clark* v. *The City of Rochester*, 24 Barb. 473, the court adverts to the principle which governs legislation touching corporations and quasi corporations.

Assuming that the power exists in the majority of the local constituency to bind the whole (and it is well established, 2 Kent, 342; Angell & Ames Corp. 396; 7 Serg. & Raw. 317), the legislature, in submitting a question affecting them to a power which can legally bind the whole, and besides, as intimated in the case cited from 24 Barb., these characters and acts touching the local municipal body, or affecting their internal condition only, are in the nature of grants to be accepted, although, for wise purposes, they are not irrevocable grants. These acts, say the court, are always passed, upon the presumption that the consent of the corporators is given, or will be signified by accepting, and this acceptance must be by the corporators, who are the inhabitants. This doctrine has been extended, in practice, to quasi corporations, to counties, to school districts, &c. In creating a new county, or a school district, a local government, involving burdens as well as privileges, is established over the people composing it, and these measures are so closely allied to the incorporation of cities and towns, that the same indulgence has been extended to them, and acts creating them have provided for acceptance by them.

It should be borne in mind, that the partition of the powers of government, by the Constitution, is confined to the supreme government; for in respect to the subordinate county governments, so far

as power is given to them, it is plain that ministerial, legislative, and judicial powers are centred in the hands of the board of police, and in the creation of city governments, and other local governments, the legislature has exercised a large discretion, and is confined to no particular form.   In some small corporations, school districts for example, we have seen the body of corporators vested with the powers which, in other cases, are confided to an elective council.   The national government, in creating the subordinate governments in territories, has in some cases blended all power in the hands of one man; it has sometimes dispensed with legislative bodies altogether.   The sovereign government, having power to destroy or create these instrumentalities, is considered a sufficient protection against the abuse of their powers.   In creating a corporation, therefore, a school district, as in the case of 13 Grattan, and in the free school law in Delaware, it was competent to vest the power of governing the internal affairs in the school voters, or in any number of the corporators.   So in a city charter, the legislature may vest part, or all of the power in the town meeting; that is, in assemblies of the legal voters, or city electors. The power to create corporations, with the incidents which attach to such franchises, as instrumentalities, as administrative agencies in the government of the State, was a well-established branch of legislative power when our Constitution was adopted; and was manifestly embraced in the grant of all legislative power, and the manner of dealing with them was equally well established; and if it is a delegation of legislative power thus to create and thus to deal with such instrumentalities, the power to do so is conferred by the Constitution.   The same thing cannot be said of the power to constitute the electors of the State law-makers.   We have thus endeavored to point out the origin and the limit to the agency of voters in the establishment of laws.   It will be noted, that so strong was the impression in the mind of the Court of Appeals in Kentucky, that this agency could only be invoked where the voters stood in the relation of corporators, that in the case in 4 Dana, and in 2 B. Monroe, they construed the laws they were considering as creating the proprietors of squares in a city, corporators in a municipality, obviously because, in so construing the laws, they invested these proprietors with power to bind by the act of a majority.   The legis-

lation which is cited in the numerous cases we have examined, and which are thought to question the principle for which we contend, has evidently been shaped with reference to the peculiar principles applicable to corporations and quasi corporations.

Let us not be misunderstood. Our proposition is that the legislature cannot invest the people or legal voters with power to make laws. The power to create municipal corporations—which are deemed to be subordinate administrative agencies—exists under the Constitution. The legislature, in creating these quasi governments, like Congress in governing the territories, is not bound to create a miniature of the State government, nor to proceed by the rules which governed the convention that framed the Constitution of the sovereign government, but may give legislative power to the inhabitants or to a portion of them in primary assembly. The forms adopted are various. The legislature, in dealing with these bodies, has exercised a discretion, when new power is conferred, in determining what portion of the corporators or inhabitants shall participate in the power, or control the exercise of power. So far as this principle extends, so far as a measure rightly proceeds on the assumption that there is power in a class of persons, owing to their connection as corporators or constituents of a local government, to bind by a majority vote, they have proceeded on a well-recognized doctrine of the common law, and the doctrine has its support in the common law to that extent and no more, but in going beyond this line there is nothing to support the practice. We have seen that usage has gone no further than to sanction the agency of voters in establishing laws, or consenting to taxes or contracts, in cases of local governments, with local constituencies. If we go beyond this line, we have no principle to guide us. The discretion of the legislature must be the only rule, and the very character of the government may be changed by its will. It is unnecessary perhaps that we should repeat here what was said at the outset, that the Act of 1858 does not incorporate the inhabitants of the district of country taxed, it does not incorporate the land-owners nor the "legal voters;" and the law is not addressed to a subordinate municipal government having a local constituency, whose agency or consent is invoked, and the "legal voters" do not stand in the relation of constituent members of the same local organization.

It is equally clear that the act is not one of that class in which power is conferred on a local government to be exercised on condition that the majority of the corporators, or of the constituency of the local government, shall, by vote, ratify or consent to its exercise. These acts stand upon grounds which do not involve the question we have been considering. The courts have held with perfect unanimity, that these are complete and perfect laws conferring powers on city or county authorities to make contracts for stock, or to exercise other powers affecting the people of the town or county, coupled with a condition that its exercise shall depend on the assent of the corporators or people of the county. The law is considered as perfect as is the naturalization law, or the laws authorizing the grant of liquor license, provided the applicant shall obtain the consent of a majority of heads of families, or comply with any other condition which the legislature sees fit to impose. No person may apply for license or be able to obtain the consent required, yet the law exists, as a permanent and definite regulation of the privilege of selling liquors, by a rule prescribed by the legislature. On the score of authority, no principle has been so universally recognized as that which distinguishes acts of this character from those in which the legislature substitutes the will of the voters for its own. It is sometimes urged, however, that in substance this is but another mode of procuring the participation of the people in the passage of laws, and that there is no difference in principle between a proposition to make a law submitted to the people for their decision, and a grant of power to a subordinate government to make a law or do an act, provided the assent of the voters is obtained. But the distinction is real. No one can fail to see the difference between an act passed by authority after the popular will has been ascertained, and a proposition which is to become law by the act of the people. It may be a vicious expedient to sound the voters at all, but in the one case it constitutes the motive for passing the law, which actually receives the sanction of the constitutional law-making power; while in the other, the absence of any knowledge of the wishes of the people constitutes the motive for not passing it, and for leaving the decision to the people without any further legislative act. When, therefore, the legislature provides that a county government or city government shall, before entering into

a contract, ascertain the will of the constituent members of the local government, it may be said to introduce a vicious principle in practice; but when the condition is complied with, and the local government makes the law or the contract, undoubtedly it has the sanction of competent authority, and the law is positive, and not in anywise dependent. If the condition be not complied with, the power is not exercised. It is impossible to conclude that the legislature may not lay such a restriction on any administrative power, if we admit that the legislature may withhold the power altogether, and this must be admitted. And it is moreover perfectly evident that the act which prescribes such a rule for the action of a local authority in a particular matter, such, for example, as taking stock in a railway, is as complete and perfect a law as the naturalization law, or the law which makes the consent of the resident heads of families in a school township, a condition to the leasing of the school lands.

The charter of the Mississippi Central Railroad, which provides that the board of police of any county may subscribe for stock, provided the majority of the voters of the county assent to it, belongs to the class of laws which we have just been considering; and the case of *Strickland* v. *The Mississippi Central Railroad*, decided, but not reported, sustains the act, the original charter, on the reasons we have given.

At this point it is proper to advert to the arguments employed in the cases which are said to throw doubt on the authority of *Rice* v. *Foster*, and the cases in that line of precedents. They argue that the legislature may delegate its power, and cite as examples the creation of corporations and local municipal bodies; that a law may be passed, and yet not be in operation without the consent of some person, or association of persons, and cite charters of private corporations and laws in the nature of grants, or contracts where the assent of the grantee is necessary; that a law may be passed to take effect on a contingency, and to show that such contingency may be the assent of legal voters, they cite acts relative to corporations or municipal bodies creating them or enlarging their powers, and annexing as a condition, the assent of a majority of the local constituency. We have already shown that the creation of corporations, as administrative agencies, was a recognized legis-

lative power at the time the Constitution was adopted.   We need not show that the government has power to make a contract or grant, while it is impossible for the government to compel the grantee to accept.   Legislative power must possess great flexibility in order to meet varying conditions of the subjects of that power, and may rightfully anticipate changes, and provide for them in advance.   The legislature may therefore prescribe a rule applicable to a condition which may occur in the subject, but which does not exist at the time the body is in session, and as it is not certain that the occasion may arise for putting the provisions of such a law into effect, the law may be said to depend on a condition or contingency. The complex legislation of Congress relative to our intercourse with foreign nations, furnishes examples of this kind of legislation, which have been cited by the advocates of popular participation in the passage of laws.   The law of Congress, cited in *Aurora* v. *The United States,* 7 Cranch, 382, is a familiar illustration.   This was an act reviving another act, which had expired, and the object was to meet an expected change in the policy of England and France. The act provided that the occurrence of the change should be indicated by the President's proclamation, and that that would also indicate when the law should be put in force.   The law thus put in force was a complete and perfect law, anticipating a contingency affecting the object of the law.   It was decided that the act stood revived by legislative will, but the occasion for enforcing it might not arise,—but when it did arise, no will but that of Congress, gave force to the law.

Certainly such legislation is no warrant, for recognizing the fact that a law may be unpopular as a contingency, and for a refusal to act, because of this apprehension, and for devolving the whole subject on the voters.   It is a positive weakness not to be able to distinguish a case in which the legislature, fearing that its decision on the expediency of a law in regard to known conditions of the subject, may not be relished by the legal voters, declines to decide upon it, and turns the matter over to the people, from that in which the legislature decides what shall be done in case future events should produce a change in the condition of the country with reference to the object of the law.

. It is ridiculous to say that the possibility of a law being unpopular,

instead of popular, is an event or contingency.   Every law is sub-
ject, at the time of its passage, to the one condition or the other,
and the election merely ascertains the fact.   This is a contingency
inherent in all acts of the legislature, and not an event connected
with the object and purpose of the laws.

The legislature may have a certain class of laws applicable to
these counties in time of low water, and another class applicable in
time of overflow.   A law may be passed providing sanitary regula-
tions in anticipation of the yellow fever, and authorize a faculty of
doctors to indicate by proclamation the appearance of disease, or
the event on which it is to be enforced or substituted for the ordi-
nary laws in ordinary times.

As is said by the court in *Barto* v. *Himrod*, the very point is,
whether the law-making power can substitute the judgment of the
voters as to the expediency of a law instead of their own.   It is a
feeble evasion to say that because it is uncertain how the voters
may decide, therefore it is a law upon contingency, and consequently
valid.   The legislature creates the contingency.

We omitted to notice the act of Congress retroceding the county
of Alexandria to the State of Virginia in its proper connection, and
pause to say of that act, that it is not an act of ordinary legislation,
but is *sui generis*.   It was a compact between independent govern-
ments affecting the political relations of the people of Alexandria.
Congress could not cede the territory without the assent of Virginia,
and might properly annex the further condition, that the assent of
the people of the ceded territory should be obtained, just as it did
in the case of Texas.   The act of annexation required the assent
of the people in convention.   Congress might properly annex, as
one stipulation in the compact, that Virginia should extend her
laws over the territory with the assent of the people of that territory.

The case of *Williams* v. *Cammack*, 27 Miss. Rep., will now be
considered.   The Act of 1850 authorized the board of police of Is-
saquena county to levy a tax on the lands of the county for levee
purposes, and provided further, that in case a majority of the land-
owners and householders of the county within thirty days should
file a written protest against the exercise of the power, the law
should be void or the power should not be exercised.   The court
held that this was a complete law, conferring power on the board

of police, subject to a condition which might defeat its exercise, and not an act which was to receive its character as law from the land-owners. The court places the case upon the authority of *Strickland.* v. *Mississippi Central Railroad,* already noticed.

The legislature in this class of cases considered the propriety of enlarging the power of the board of police, to enable them to accomplish a local object, and determined to grant the power subject to a condition. It cannot be said that this purpose to make the grant on the terms prescribed, is not definitely expressed in the law, or that it depends on the popular will for its character as a grant. But in the Act of 1858, the legislature did not undertake to decide on a grant of power to a local government, but had under consideration the question, is it expedient for us to levy a tax on the district subject to overflow? They do not decide this question, but determine that the governor shall, by proclamation, call an assembly of the voters and submit to them the question of levying a tax, taking their "sense" on the question "tax or no tax," declining to levy the tax, and not pretending to grant power to the boards of police to levy it. The difference between this act and that of 1850, is precisely the same that exists between the original charter and the supplemental charter of the Mississippi Central Railroad, Acts 1852, 74, 117, 161. The supplemental act is obviously void, because the expediency of levying the tax was left entirely to the decision of the ballot. The legislature declaring that the act providing for a tax on all lands within ten miles of the Mississippi Central Railroad, should not take effect unless the majority of the voters should vote in its favor. The Act of 1858, by the terms used, by a proviso, which is a condition precedent to the levying of the tax or the taking effect of the law, declaring that it shall first be submitted, and using language characterizing the tax as a proposed tax, contains, in effect, the declaration that the act is not to have effect until it is ascertained that the voters are in favor of it. The shallow artifice by which they omit to use express words, that the vote shall give effect to the law, of which we have before spoken, constitutes the only difference. It is too plain, however, for doubt, that in each case the legislature did not say, "let there be a tax levied," but let there be an election held, in order that the voters may determine whether there shall be a tax or no tax. The differ-

ence between the law considered in the case of *Williams* v. *Cammack*, and the Act of 1858, may be illustrated, to a legal mind, by the case of a deed to land, without conditions, made and delivered to a third party, to be delivered to the grantee in a certain event, and that of a deed with a condition of defeasance, delivered to the grantee. In the last case, the title to land passes and the deed is operative, but liable to be defeated by a subsequent event, but in the former the deed is inoperative until the event on which it is to be delivered happens. Title passes in the one case and not in the other. The Act of 1858 took effect as an act directing the governor to call an election, but not as an act levying a tax. That will was not expressed. The act was complete as an act directing the governor to call an election to determine the sense of the people whether there should be tax or no tax, and if the act declares that it shall be in force from and after its passage, it means that it is in force as a direction to call an election, which is to make it law or no law, tax or no tax. To say that it was a tax law, a positive assessment until the election, which might put an end to it, shows an inveterate determination to uphold this void legislation. We know that until the election, it was what it purports to be,—a proposition to be voted on at the election, and nothing more.

The proviso to the first section of the act is a condition precedent, by the plainest rules of law and common sense. The tax is not levied absolutely, but provided it shall first be submitted to and approved by a majority ; and we cannot reject the proviso or condition precedent and hold on to the tax, for the tax is dependent on the proviso. A condition precedent, although void or impossible, must, nevertheless, be performed, or no estate passes, and the law cannot go into effect until the proviso is complied with. In *Voorhees* v. *Bank of the United States*, 10 Peters 471, the court held, that where an act declared that a sale should take place, provided, however, notice be first given, the proviso was a condition precedent, and no sale could be valid without a compliance with it. No lawyer would hesitate to say of a deed or will which gave property to a person, provided he should first execute a release or renounce a title, that it was a grant with a condition precedent, which could not take effect, whether the condition was void or not, until it was performed.

We cannot reject so much of the 1st and 29th sections as provide for the submission of the question, "tax or no tax," to the legal voters, and regard the remainder of the first section as an absolute assessment of the tax.   If the first part of the first section, to wit, the words, "Be it enacted, that there be and is hereby levied and assessed a uniform tax," is dependent on the provision for calling an assembly of the voters and submitting the question to them, and intended to be dependent on the result of the votes,—of course we cannot reject those provisions as immaterial or void, without rejecting the whole of the first section.   The argument, so far, is based on the position, that there is a necessary and absolute dependency of the first section on the proviso, which, by the use of unusual words, which were obviously chosen, because they left no doubt of the character of the provision,—indicates that the election was a condition precedent to the act taking effect: "Provided the proposed tax shall first be submitted."   Of course, in asserting that the legislature merely proposed a tax, or the question, "tax or no tax," to the people, leaving it to them to decide, we assert the dependence of this section on the proviso; and if we have shown that such was the character of the act, the court cannot convert a bare proposal, or an act calling an election to determine whether a tax shall be levied, into an absolute imperative law imposing a tax. This would be judicial legislation.   To present this idea with clearness, let us suppose that the tax had been voted down at the election, and notwithstanding this result the sheriffs had proceeded to collect it,—would the court uphold the tax against the legislative will, and declare that it should be collected, when the legislature had said that it should not be collected ?   The legislature having declared that the will of the majority should be the will of the legislature, the court is bound to say that we have no legislative will definitely declared, and for that reason the section is void; or that having substituted the will of the majority of voters for the legislative will, it is void for that reason.   To cut off the qualification, and thus make the tax absolute, is to convert a proposition into a law,—to declare arbitrarily that the legislature willed a tax, when it is certain that they did not, unless the voters were willing, and if unwilling, they willed there should be no tax.   This would be as bad as the atheist who supported his creed by Bible authority;

taking the passage, "The fool hath said in his heart, there is no God," and omitting all but the words, "there is no God." The court would in effect levy the tax, and do it in direct opposition to the legislative will,—that it should not be levied without consulting the people. See the forcible views of Wright, Justice, in *Santo* v. *State*, 2 Iowa, 203.

The rule is, that you may reject a void section or provision in an act, and sustain so much of the remainder as is not dependent on the part rejected. It is substantially the same rule in regard to wills containing void bequests, if we reject the void bequests, we reject all other bequests dependent on them. There is no better rule on this subject than that which common sense teaches. If you can take out the defective parts without interfering with the obvious intention of the legislature or the testator, you may reject them; and if there be any part of the will or the law entirely independent and disconnected with these defective parts, you may retain them. So that it will be seen we are no nearer the solution of the question, though we might parade all the law books in the world on this matter of rejecting provisos and conditions. We at last have to determine whether the first section is dependent on the proviso; and that is the very point in controversy, and we think we have conclusively shown the dependence of the tax on the popular vote: if we have not, we have failed in this branch of the argument. Shall we say that the legislature intended to tax the people whether they were willing or not? If so, for what purpose did they say, that before a dollar should be raised under the act, the voters should be assembled and vote on it? Why take the "sense" of the legal voters? Why ask the voter, "Are you for or against the tax?" if it was to be a tax at all events? Is there a rule of interpretation in courts of justice, in regard to the most vital questions ever considered by the country, which flatly contradicts the known and positive truth of the case? Is the court to cut up the statute, and substitute "directed" for "proposed," and say that "first" does not mean before, but *after*, and thus pervert language and sense, in order violently to fashion the work to fit the Constitution?

Usage, at least, seems to sanction the power of the legislature to assess directly or through the instrumentality of local administrative agents the expense of improvements exclusively local, on those who

receive the benefit of such improvements.   The instances of street assessments for paving and the like, are examples.   We have heretofore asserted, and we think proved, that this power must be exercised by the legislature, and that unless there exists amongst the persons taxed, some relation as corporators, that a majority of them have no power to bind the whole by vote, and that the power cannot be conferred upon them.   We have seen that in the Kentucky decisions, the court seemed to consider that it was necessary to establish this relation; so the New Jersey court seems to admit in 4 Zabriskie, 385.

The legislation under which local assessments are made, is confined almost exclusively to cities and towns, and the power is conferred on local magistrates to make the assessments on the petition or requisition of the majority in interest, of the property to be taxed. These assessments are said to be self-imposed, and matters of private rather than of public concern.   There is nothing, however, in these examples to vary the doctrines for which we contend, nor to affect the present case and the questions involved in it, because there is no pretence that the tax under the law of 1858, was to be a self-imposed tax by proprietors of lands benefited.   It was imposed by legal voters, and not on the application nor by the consent of the land-owners.   Besides, the act is of a totally different character. The tax is levied partly to pay off county debts, and the legal voters of one county are called on to vote a tax on the land-owners of another county, to pay the debts of the latter.   The legal voters of Bolivar vote a tax on land-owners in Yazoo to build a levee in Bolivar, and at the same time vote the exemption of Bolivar county land-owners, from the expense of the local improvement in that county for three years.   The complainants in these bills, citizens of Yazoo county, are taxed against their consent, not by the legislature nor by their own local government, but by the votes of electors of distinct county organizations, voting under the strong temptation of having the expense of a levee for their own protection borne exclusively by Yazoo land-owners, and other land-owners of back counties, for the space of three years.   All protection of a responsible local government is withdrawn, and they are committed to the mercy, not of persons similarly situated, but of legal voters, without any check or responsibility; without any guide save their

own caprice.   The revenue for a public work of the first magnitude in the State, whether on the score of cost or its influence upon public and private interests, is thus drawn from private property, by an authority not recognized by the Constitution.   The American mind is becoming educated to regard the legal voters as the repositories of all power, when in fact they possess but one power.   That one power, however, places in their hands the high prizes of station, power, and emoluments, and has, by a natural law, secured that devotional homage which invests them with infallible wisdom and immaculate virtue.

It is hard to rid the mind of the idea, that it rather adds to the force and authority of a law, that it comes directly from the so-called "fountain of all power."   But there is not a government on earth in which the people are more carefully excluded from participation in the enactment of laws, than by our own.   The democratic principle is the direct antagonist of the representative principle; and to lose sight of this truth is to make our government a "government of expedients and not of principle."

We propose to conclude this argument by noticing the remaining prominent objection to the Act of 1858, which is, that it is in effect an act appropriating money from the treasury, for objects of internal improvement, and is a mere majority bill.

There are two treasuries known to the Constitution and laws,— the county treasury and the State treasury; perhaps we may add to these, the treasuries of the local municipal governments, of a public character.   Revenue collected by law, is the public treasure, of one or the other of these treasuries; and if it be not money of the county treasury, or of a municipal corporation, it must belong to the State treasury.   Money collected as revenue under a public law of the State, is part of the treasury, whether it is paid into the strong box at Jackson or not; when a tax is levied it is a debt to the treasury.

It will not be contended that a bill raising revenue for a general system of internal improvements, and directing the money to be paid over to an officer constituted by it, as a superintendent of public works, and to be expended by him in constructing roads, improving the navigation of rivers, and making canals, could be passed by a bare majority.   If so, the Constitution affords no pro-

tection against the most extravagant expenditures, and the most oppressive burdens.

The same reason which led to the restriction on the power to borrow money, to pass revenue bills, and to the prohibition against drawing money from the treasury except in cases provided by law, lead to the restriction as to bills for internal improvements. The object was to prevent extravagant expenditures, and to protect the people from oppressive burdens. Experience had taught the framers of the Constitution, that internal improvements offered the strongest temptation to wasteful expenditure. Such expenditures are extraordinary, beyond the ordinary expenses of administering the government. These burdens can be made as oppressive by bills which provide for disbursing the money through a general agent, or local agents, before it comes into the strong box at Jackson, as by bills appropriating the money after it is technically under the lock and key of the treasurer. If by localizing the tax, the legislature can burden part of the people with this extraordinary expense by a majority bill, the most stupendous public works may be carried on, and the most enormous taxation entailed upon the people in spite of the Constitution. The Constitution was not dealing with names, but with things. It undertook without going into detailed specifications to declare principles. The principle of the prohibition is to protect the people against taxation for internal improvements, and the extravagant expenditures to which they lead. But if the legislature may levee the bank of the Mississippi river along our whole border, build a railroad through the centre of the State, and make Pearl river navigable by means of deepening the channel, or by locks and dams,—by majority bills localizing the tax, under the power to apportion the public burdens,—it is impossible to see in what manner the citizen is protected by the Constitution. It is remarkable that, while other States are amending their Constitution, and imposing restraints in regard to local legislation, because of the manifest abuses to which it leads, that we should find in them a pretext for disregarding the fundamental theory of our representative system, and for casting aside the great conservative checks on legislative power. It is needless to add, that this question has not been decided in the case of *Williams* v. *Cammack*, nor in any other case. The construction of the Consti-

tution in respect to bills for internal improvement, remains to be given. Money collected for county purposes, or for city purposes, or by any local government for its own peculiar objects, constitutes the only exception to the prohibition.

*Nye* and *Hill*, on same side,

Argued the cause elaborately in support of the propositions contended for by the associate counsel, W. P. Harris, Esq.

*Yerger* and *Anderson*, and *Yerger* and *Rucks*, in reply.

The principal objection to the validity of the "Levee Law" of 3d December, 1858, is based upon the proviso in the first section, which is in these words : "Provided, however, that the said tax proposed to be levied, shall first be submitted to the legal voters in the district of country proposed to be taxed, on the first Monday in January, 1859, which said election shall be conducted in the same manner and upon the same notice as other elections ; and if a majority of the legal voters residing in the district proposed to be taxed, vote against said tax, then the same shall not be levied or collected."

It is objected to this proviso, that the assent of a majority of the qualified voters was, by this provision, made a condition precedent to the validity of the law; and that in submitting to the qualified voters the question of "tax or no tax," the legislature submitted to them in effect, the enactment of the law. That the "Levee Bill," as it passed the legislature, was not a law, but only a proposal to enact a law, if it met the concurrence of the voters of the district. That it was not mandatory, and was in effect a delegation of legislative authority to the people, and thus violated the letter of the Constitution, which vests the legislative power of the State in the legislature, and violated the whole spirit of the Constitution by subverting the government from a representative republic, as organized by the Constitution, into a pure democracy, in which the enactment of the laws is placed immediately and directly in the people.

I propose to show that the proviso is not obnoxious to these objections, and believe I can demonstrate its constitutionality both from reason and authority. But conceding the proviso to be un-

constitutional, I propose to show in the second place that this fact does not destroy the validity of the remainder of the statute, which may and will be enforced, regardless of the proviso.

The chief justice of this court, in the case of *The State* v. *Johnson*, 25 Miss. R. 142, declared, "that the legislature possesses the entire legislative authority of the State, and may consequently perform any act of a legislative character which is not repugnant to the Constitution of the United States, nor expressly prohibited by that of the State of Mississippi."

It is believed that this view of the powers of the Mississippi legislature will meet the approval and sanction of this court.

In the same opinion, the chief justice declared, that " a municipal law, according to the American theory of government, is the expression of the legislative will of the State, according to the forms of the Constitution." 25 Miss. Rep. 147.

It is conceded that the Act of 2d December, 1858, was passed according to the forms of the Constitution. It is also conceded that the Constitution contains no specific clause prohibiting legislation of this kind. But it is objected, that it destroys the representative principle, and in effect places the enactment of the laws directly in the hands of the people, and thus being repugnant to the fundamental theory of the government, is unconstitutional. We respectfully submit, that such is not the character of the act under consideration. It had its origin in the legislature ; it duly passed that body according to the constitutional forms. Throughout, the legislative will is spoken in imperative terms. It is mandatory in all its provisions. It never speaks by the way of counsel or advice, but always in terms of command. Even the obnoxious proviso itself is mandatory, and declares that the tax assessed by the enacting clause " shall not be levied or collected" on the happening of the contingency referred to in the proviso.

Looking at this statute from this point of view, let us determine, if we can, the " legislative will" in its enactment. The leading and general intent evidently was to raise a fund by taxing the lands lying within a certain district for the purpose of constructing and repairing the levees in that district. This intent is expressed in the first section of the act, which declares that a uniform tax of ten cents an acre per annum shall " be levied and assessed," &c. ; and

most of the provisions of the law are intended to carry into effect this general intent.

But, subsidiary to this general intent, it was also a part of the "legislative will," and so expressed in the proviso : that the tax provided by the enacting clause " should not be levied or collected if a majority of the qualified voters in the district were opposed to its collection ;" and the proviso contained the necessary directions for ascertaining the wishes of the voters on that subject.

It is evident that the proviso, and the condition contained in it, are as much a part of the " legislative will" expressed according to the constitutional forms, as the body of the act itself ; and are therefore valid, unless the legislative will so expressed is repugnant to the fundamental spirit of the Constitution, or violates some express provision of that instrument.

As before stated, no express provision of the Constitution is violated by the proviso. If it violates the spirit or fundamental theory of the government as is alleged, that effect must necessarily result from one or two causes, to wit : either the legislature had no constitutional power to make the law dependent for enforcement on a condition to happen in future ; or if it possessed such a power in the enactment of laws generally, then the particular condition contained in the present law forms an exception to the general power. The question then arises : does the legislature possess the power to make the enforcement of laws depend upon a contingency to happen in future ? second, if so, is it unconstitutional to make the approval of the people such a contingency ?

On the first of these propositions we presume there cannot be two opinions. Every decision and judicial *dictum* in this country concede to the legislature the power to make conditional laws, or laws which are to go into effect upon a future contingency.

The action of the Federal and State legislatures, and the decisions of the State and Federal judiciary are uniform on this point.

We will not undertake to cite all the acts of the legislatures of this character, nor to enumerate all the opinions of the courts sustaining them.

Among the most prominent we will refer to the non-intercourse Acts of 1809, 1810, and 1811, which laws were made to depend expressly upon the course that France and England might adopt

upon the same subjects of legislation, and which course, when ascertained, was to be made known by the proclamation of the President, and the laws were thereupon to go into effect.

The validity of these laws was discussed before the Supreme Court of the United States, and that court declared that the "legislature might make a law dependent on a future event, and direct that event to be made known by proclamation of the President." See case of The Aurora, 7 Cranch, 382.

Again, in the celebrated question of admitting Missouri into the Union, Congress made her admission depend upon a "fundamental condition" recited in the body of the act, and the resolution of admission was only to take effect upon the condition expressed in the proviso, " that the legislature of said State by solemn public act shall declare the assent of the said State to the said fundamental condition, and shall transmit to the President of the United States, on or before the fourth Monday in November next, an authentic copy of said act, upon the receipt of which, the President, by proclamation, shall announce the fact, whereupon, and without any further proceeding upon the part of Congress, the admission of said State into this Union shall be complete." 3 U. S. Statutes at Large, 645.

The validity of this act, or its constitutionality, has never been questioned.

But again : Congress, by Act of July, 1846, provided that the county of Alexandria, then a part of the District of Columbia, might be ceded back to the State of Virginia, provided a majority of the qualified voters of the county were in favor of it, and provision was made for holding an election to decide this question. If a majority were against accepting its provisions, it was to be void and of no effect; but if a majority were in favor of it, it was to be in full force.

This act of Congress, we believe, has never been impeached, nor its constitutional validity attacked. In this State, as also in every other State, similar legislation has taken place without objection. We deem it only necessary to refer to the legislation in relation to the seats of justice in the different counties, by which, in nearly every instance, their permanent location is made to depend upon the will of a majority of the voters in the county.

Taking it for granted that it will not seriously be contended that

the legislature has not power to pass conditional laws, and without pretending to cite the numerous cases in which it has been decided that it does possess such power, all of which will be found referred to in the original brief filed by counsel for appellants in this case, we proceed to the examination of the second point, to wit: Is the condition contained in this statute, an exception to the general rule; that is, does the fact that the tax was not to be collected, if disapproved of by a majority of the voters of the district, constitute an invalid condition? Tested by reason, we are at a loss to conceive why this condition is more obnoxious than any other. In theory, the American governments are based upon the express will of the people. Proceeding from the people, and accountable to the people for the manner in which he executes the trusts committed to him, the representative in the enactment of laws, is in theory supposed to express the will of his constituents. It is true, he may arbitrarily disregard that will; he may, under the forms of the Constitution, pass laws to which a majority are opposed; and until repealed, these laws are constitutional, and will be enforced. But as the enforcement of all laws in a republican government must, to a great extent, depend upon the approval which they receive from the great body of the people, a conscientious representative and a wise statesman will never, except under extraordinary circumstances, advocate the enactment of a statute which he believes a majority disapprove. Certainly it is no objection to a law, that a majority of those who are subject to it, approve of it; and we presume no one will be heard to say that a law is less valid, less constitutional, or less judicious, because it has been passed in accordance with the expressed and ascertained will of a majority of the people. The very fact that the Constitution guards and protects the right of the people to petition the legislature, is based upon the idea that the wishes of the people is a proper subject of legislative consideration.

If then it will not detract from the validity of a law, that it has been passed and is declared on its face to have been passed according to the expressed will of the people, in what way does the fact that it is approved of by a majority of the people after its passage affect its validity?

The approval of the people does not pass the law; that approval does not give it validity. As a law it obtains its force, it derives

its power alone from the action of the legislature. It is the legislative will, expressed in the act, which gives force to the approval of the people, and not the approval of the people which gives force to the legislative will.

But it is said, if the people do not approve the law, it cannot take effect. This is true. But it is also true of all contingent or conditional legislation, that the law will never take effect till the contingency happens, or the condition is performed.

The fallacy in argument of those who oppose this kind of legislation proceeds from this,—they overlook the fact, that it is the " legislative will" which prescribes the condition and gives validity to it, and not the condition, or its performance, which brings into being the "legislative will." Unless, therefore, the approval of a law by the people contains something peculiarly odious, there certainly is no stronger reason for declaring a law void, which is to take effect on condition of their approval, than there is for declaring all conditional laws void.

In relation to local legislation and the appropriation of money for local purposes, there seems to be great propriety in leaving to the tax-payer to decide whether he wishes the tax levied and his money appropriated. If, in the opinion of the legislature, the necessities for the local improvement are not of such absolute and imperative public necessity, as to require an unconditional appropriation, what is there of immorality, what is there of illegality, and how does it conflict with the representative theory of government, for the legislature to declare that a law, appropriating money for purposes of local improvement, shall not take effect, if it does not meet the approval of those for whose benefit the improvement is intended?

The position assumed, that in legislation of this kind it is the approval of the people which makes the law, is a sophism not more tenable, than to declare that it is the performance of a condition in a grant which grants the estate, and not the grantor who prescribes the condition. This may be illustrated by reference to conditions in deeds or wills. If an estate may be devised with proper formalities to vest in A., upon condition that his father approves the devise,—could it be said, with any semblance of reason or logic, that the father, by his approval, either devises the estate

or makes the will?   Yet it is not more illogical to maintain this proposition, than to assert that a statute passed according to the constitutional forms, by the law-making power, is enacted by the people, because the law-maker prescribes a condition that it shall not go into effect until approved by the people.

But again, let us take an act of the legislature itself, importing the grant of an estate.   If an act be passed, granting a tract of land to A., but not to vest in him, nor to take effect, unless B. approve the grant, will it be said that B., by his approval, makes the law and grants the estate, or only that the grant becomes absolute by the performance of the condition, in accordance with the will of the grantor?   But it is said that the act under consideration is not a law, because the proviso in terms declares, that the approval of a majority shall be a condition precedent to the collection of the tax; and as this statute could not be executed, nor go into effect until the performance of the condition, therefore, it is not a law, but only a proposition to make a law.   This mode of stating the case begs the question.   It takes for granted that which it is incumbent on the appellees to prove.

As before defined, " a law enacted by the legislature is the expression of the legislative will in the manner prescribed by the Constitution, establishing a rule of action on a given subject."   If then it be the " legislative will," expressed according to the constitutional forms, that the operation of the law shall be suspended till a vote of the people is taken, and that it shall cease to operate if a majority vote against it, how can it be said that this " legislative will," so expressed, is not a law?   It is the enactment of the law-making power.   It is passed according to the forms of the Constitution.   It contains an " expression of the legislative will."   It prescribes a rule of action in reference to the subject-matter, and contains every essential element of law.   It is true, it contains a clause which may defeat its operation.   It contains a condition, the non-performance of which may prevent its enforcement; but that clause and that condition is the act of the law-making power, and is the expression of the " legislative will" on that particular subject.

We are thus again brought to the position, assumed in the commencement of this argument.   Either the legislature has no power

to enact conditional laws, or else a condition that a law shall cease to operate, if not approved by a majority of the people of a particular district, is an exception to the general power.

To our minds, it seems clear that this case cannot be withdrawn from the operation of the rules laid down in *Williams* v. *Cammack*, 27 Miss. Rep. 209, and *Strickland* v. *Mississippi Central Railroad*, referred to in that opinion.

In the case of *Williams* v. *Cammack*, the condition of the act was: "If a majority of the legal voters, landholders or householders in said county, shall enter a written protest against the provisions of said act before the board of police, at their first meeting after the 4th of July next (after its passage), setting forth their objections to the act, then the act shall be void and of no binding force."

It was objected to this provision, that its operation was made to depend upon the determination of a majority of the voters of the county whether it should become a law or not. But. the court says : " This objection is founded in a misapprehension of the provisions of this section. The act in terms possessed every essential quality of a complete and operative act. Nothing was required to be done by the people to give it force and effect." The authority given to the freeholders or householders to protest against the act, when it was to become void and of no binding force, " certainly gave no force to the act, but was intended expressly to put an end to its operation."

Compare the twelfth section in the act of 1850, thus declared by the court to be valid, with the first section of the law and the proviso in the present law, and it is impossible to draw a distinction between them.

The enacting clause of the first section, speaking in the present tense, declares that a tax " be and it is hereby levied and assessed." But the proviso declares that this proposed tax shall first be submitted to the legal voters of the district, at an election to be held on the first Monday in January, 1859, " and if a majority of the legal voters residing in the district, vote against said tax, then the same shall not be levied or collected."

It will thus be seen, that by the enacting clause, the legislature assessed the tax, but the collection of it was suspended till the first

Monday in January, 1859. The words "the tax proposed to be levied and collected shall first be submitted," &c., were not intended to submit to the people the question whether the act should not have any effect until a majority of the legal voters voted in favor of it, but only to suspend the enforcement of the law till after a vote was taken. The proviso does not declare that the act shall not go into effect until a majority vote for it, but simply that "the tax shall not be collected if the majority vote against it."

Here the vote of the majority, as in the case of _Williams_ v. _Cammack_, would give no force to the law, but, as in that case, the sole effect of the vote could be and "was expressly intended to put an end to its operation."

This is clear from the very language, and certainly is the spirit of the proviso. It was not the vote which was to give force to the law; a majority might put an end to its operation, but it did not require the vote of a majority or any number to give it force and validity, as is positively apparent from this fact,—if, at the election in January, there had been a tie vote, and the same number had voted for as against the tax, the law would still have been operative and gone into effect; because the proviso suspended its operation only till the first Monday in January, and till one election, and because the enacting clause and the various other sections of the act made full provision for the enforcement and collection of the tax, if a majority did not vote against it at the election on the first Monday in January. It is very evident, therefore, that the vote of the people added nothing, and was intended to add nothing to the validity or force of the law, as a law, but simply to defeat its operation, on the contingency that at the election on the first Monday in January, 1859, a majority voted against it.

But the case of _Strickland_ v. _Mississippi Central Railroad_, is, if possible, more directly in point than _Williams_ v. _Cammack_. By the act chartering the Mississippi Central Railroad, authority was given to the board of police of certain counties to subscribe for stock in the road: "Provided, however, that an election should be holden in the county, for and on account of which said stock is proposed to be subscribed, &c.; and if a majority of the qualified electors voting shall be in favor of such subscription, then said board shall make such subscription; but if a majority of those voting shall

be opposed to such subscription, the same shall not be made." See Act of 1853, § 17, ch. 21.

It will thus be seen that in this act the power to make the subscription was made to depend on a vote of a majority in favor of it. Nevertheless, the court held a subscription made under this law valid and obligatory, and the law constitutional. The only difference between that and the present case is this : there the legislature authorized the boards of police to subscribe for stock, provided a majority of the voters in the county first voted in favor of it; here the legislature " levy and assess the tax," but declare that it shall not be collected, " provided a majority of the legal voters in the district shall, on the first Monday in January, 1859, vote against it." In the one case, the boards of police are authorized by the law to make the subscription, provided the people assent to it. In the other, the officers are prohibited from collecting the tax, provided a majority vote against it. But in each case the "legislative will" is expressed according to constitutional forms. In the one, permitting the board to make the subscription upon the condition annexed; in the other, prohibiting the collection of the tax upon the condition expressed.

But the position assumed by counsel for the appellees, that the condition contained in the proviso is a condition precedent, to be performed, in order to give force and vitality to the statute as a law, is clearly not maintainable.

A condition precedent is defined to be "a condition which must take place before an estate can vest or be enlarged."

Conditions subsequent are those which operate on estates already created and vested, and render them liable to be defeated.

Now in this statute, the enacting clause of the first section provides for the "levy and assessment" of the tax. Various other sections provide for the collection, disbursement, and appropriation of this tax, and the last section provides that it shall take effect and go into force from its passage. Here, then, is a full, complete, and absolute exercise of legislative power. The enacting clause assessed the tax; other sections provide for its collection. But the proviso contains a condition which may defeat the collection of the tax, but that contingency must necessarily happen after the passage of the law. It must happen subsequent to the assessment of the tax in the

Alcorn v. Hamer.   Same v. Hill.

enacting clause of the first section.   In the enacting clause, the legislative will is expressed that a tax shall be assessed.   But it is provided that the collection of that tax may be defeated by a condition which must happen afterwards, to wit, the vote of a majority against it.

It is manifest that this consideration is no condition precedent to the enactment of that law.   It is no condition precedent to the right to collect the tax, because, if a majority do not vote against the law,—if it is a tie vote, the law may still be enforced, because the condition which is to prevent the collection is that a majority shall vote against it.   Inasmuch, then, as the proviso did not require a majority to vote for the law to make it operate ; as it did not declare it should not go into effect in the case of a tie ; it is manifest that no vote was required to give force or validity to the law.   The law was therefore operative *proprio vigore*, but might be defeated by the happening of the condition.   It is evident, therefore, that the condition in the proviso is not a condition precedent.

. We might cite examples as illustrative of the rule.   As a feoffment to A. of lands, upon condition that he kill B., or a devise of lands to a town for a schoolhouse, upon condition that it is built within one hundred rods of the place where the meeting-house stands.   Other examples might be cited which will readily occur to the court.   See Kent's Com. 8th ed. 127, 130 ; Comyn's Dig. title Condition.

This, then, being a condition subsequent, if we admit it to be void for unconstitutionality, it will not impair the validity of the act in other particulars.   On this point the rule is well understood to be, that in all cases of condition subsequent, if the condition be void or illegal, the estate is absolute.   4 Kent's Com. 8th ed. 135 ; 2 Cruise's Dig. tit. 13, ch. 1, §§ 18, 19, 22 ; In Coke Inst. 206 ; 1 P. Wms. 289.

But conceding, for the sake of argument, that the proviso is unconstitutional because the legislature had no power to refer the question to the people, still it is well settled that if the remainder of the statute is constitutional, it will be enforced regardless of the illegal proviso.

This court has repeatedly decided, and, in the language of

Chief Justice Shaw, in the case of *Fisher* v. *McLin et al.* 1 Gray Mass. R. 21, we may state the rule of law to be now well understood : " That where a statute has been passed by the legislature under all the forms and sanctions requisite to the making of the law, some part of which is not within the competency of the legislative power, or is repugnant to any provision of the Constitution, such part thereof will be adjudged void and of no avail; whilst all other parts of the act not obnoxious to the same objection will be held valid and have the force of law." See also *Williams* v. *Cammack*, 27 Miss. R. 218 ; also see *Brown* v. *Beaty*, 34 Miss. R. 227, in which the chief justice declares : " But because this provision is repugnant to the bill of rights, and therefore void, it does not follow that the other provisions, which are distinct and independent of this, are also invalid ; the reverse, according to the settled rule of construction, is the case."

In accordance with these views, several courts have held, that although provisions similar to this might be void because exceeding the legislative power, yet they would enforce the law and disregard the illegal condition. 2 Iowa R. 205 ; 4 Indiana R. 342.

But this whole doctrine which the counsel for appellees invoke, to wit, that an estate upon a condition precedent will never vest until the condition be performed, whether the condition be impossible or illegal, only applies to cases in which the grantor or devisor being owner of the estate has power to annex any condition to his grant or devise that he sees fit. None of them apply to the exercise of delegated powers where the party granting the estate acts only under a power.

According to the theory of the appellees, the legislature act only under a power conferred by the Constitution. What that instrument authorizes or does not prohibit, either expressly or impliedly, that the legislature may do, but nothing else. Hence, it is said, this proviso is void, because the legislature under the Constitution had no power to enact it.

If this position be conceded, it will not strengthen the case of the appellees. On the contrary, it destroys it.

On this point, the rules of law are established beyond doubt or cavil to be this : Wherever a party acts under a power, and annexes conditions not authorized by the power, the grant is good, and the

condition only is void, and the appointee takes the fund absolutely. See 2 Sugden on Powers, 76, *et seq.*

On this point, Mr. Sugden says the rule deducible from all the cases is this : "Wherever the boundaries between the excess and proper execution are precise and apparent, the execution will be upheld where it is proper and held void for the excess." Ib. 76.

So, too, Judge Story states the rule distinctly : "Where there is a complete execution of the authority and something *ex abundanti* is added, which is improper, there the execution is good, and the excess only is void," provided the boundary between the excess and the rightful execution is distinguishable. Story on Agency, § 166.

Thus, " If a letter of attorney be to make livery absolutely, and the attorney make it upon condition, this is a good execution of the power, and amounts to a sufficient livery, and the condition is void." Ib. § 168. See also 25 Miss. R. 795.

In fact, the logical conclusion is inevitable: if the legislature had the constitutional power to annex the condition contained in the proviso, then to that extent the enacting clause was limited and restrained ; but if the legislature did not have the power, then the proviso is void for want of authority ; and being void, the enacting clause must stand absolute.

This follows from the very definition of a proviso, which is "something engrafted upon a previous enactment," which limits or restrains its effect. Dwarris on Stat. 9 Barn. & Cress.

In construing statutes, a saving clause is to be rejected when it is directly repugnant to the purview or body of the act, and cannot stand without rendering the act inconsistent and destructive of itself. But if a proviso is directly repugnant to the purview, the proviso stands and is held a repeal of the purview, because it speaks the last intention of the lawgiver. In relation to the distinction thus made between a repugnant proviso and a repugnant saving clause, Chancellor Kent says: " It is difficult to see why the act should be destroyed by the one and not by the other, or why the proviso and the saving clause, when inconsistent with the body of the act, should not both of them be equally rejected." 1 Kent's Com. 8th ed. 512.

It will be remarked, however, that the books, in speaking of pro-

visos which are to invalidate the body of the act, refer only to those which are valid in themselves, and capable of enforcement as the legislative will; for a proviso repugnant to the purview of the act is upheld only because it is supposed to express the last intent of the legislator, and to amount to a repeal of the body of the act.

But if the legislature had no power to enact the proviso, it is obvious that it cannot repeal a valid enacting clause, or purview.

Suppose the "Levee Act" had passed without the proviso, and the legislature, by supplemental act, had declared, in the language of the proviso, that the "proposed tax mentioned in the first section of the act shall first be submitted to the voters of the district, and if a majority voted against it, it shall not be levied or collected." We suppose no one will contend, if such supplemental act was unconstitutional and void for want of legislative power to pass it, that it repealed or affected the validity of the preceding valid enactment. But there is certainly no reasonable distinction between the two cases. In either case, the legislature attempted, what it had no power to do. In both cases its action is void, and in neither case can the unconstitutional and void act legitimately impair or invalidate that which is properly done.

But it may be said, that the legislature would not have passed the remainder of the act without the proviso. This argument might be made against the enforcement of any part of any statute containing an unconstitutional provision. It might be made against every act under a power to which a condition not authorized by the power is annexed, and if sound as an argument, would destroy all grants to which illegal and void subsequent conditions are attached. Yet in all these cases, that which is valid is upheld, and the illegal condition disregarded.

This brings us to the consideration of the other positions assumed for the appellees, untenable, as we believe, on principle or by authority.

The decisions cited by us are so numerous and conclusive that a local law, for local purposes, is valid, though submitted to the people of the locality, and made contingent in its operation on their approval, that an attempt has been made to draw a distinction between them and this case. A distinction which does not exist in fact, and was not even alluded to by the learned courts deciding those cases. An

examination of them will show the fallacy of the argument, which is founded in a mistake of fact in relation to the principal cases.

The argument of counsel is, that in all the cases sustaining legislation of this kind, powers were conferred on existing corporations, or on corporations created by the act, and that the only question submitted to the people, was a submission to the corporators, whether they would accept the provisions of the law. This argument is founded on a misapprehension of the facts of the cases, and is utterly at war with the principles on which they were decided.

Except in one or two cases where the statute conferred additional powers on corporate bodies, the principle announced and decided, in every case, is, "that where a law is intended to benefit a particular locality, or district, or county, and a burden in the shape of taxes is imposed, or must necessarily result, and the law is made dependent or contingent on the vote of the people of the district or locality, it is constitutional." The cases do not even allude to the position taken by counsel, to wit, that the submission is to the people as corporators, or in their corporate capacities, and therefore constitutional. Upon this point we respectfully ask attention to the reasons and principles on which the following cases were decided, and it will be found that they establish the doctrine, that the legislature has the right to pass contingent laws, and that this contingency may be the vote or consent of those affected by them, whether corporations or not: *Bull et al.* v. *Read*, 13 Grattan's Rep. 78; *Cin.* v. *Clinton County*, 1 McCook, 77; *State* v. *Parker*, 26 Vermont, 337; *People* v. *Reynolds*, 1 Gilman, 1; *Slack* v. *Lexington and Maysville Railroad*, 13 B. Mon. 1; *People* v. *Quarter Sessions*, 8 Barr, 395; *Comm.* v. *Painter*, 12 Ib. 214.

Many other cases are referred to in our original brief; in all these the courts say: the contingency and the clause submitting the laws to the vote of the people are as much the will of the legislature as any other enactment.

But suppose it be true that there had been cases of municipal bodies or corporations, or quasi corporations, in which the people were the corporators. Still they could only vote or act so far as they had existing power. Every new law affecting them, by imposing additional burdens or conferring additional powers, as laws taxing their property, or permitting subscriptions for stock, would

Alcorn *v.* Hamer.   Same *v.* Hill.

require legislative sanction. If then it be unconstitutional to submit a law to the approval of the people of an unincorporated district or locality, how can it be less constitutional to submit a like law to the people residing in an incorporated district? Why is any law submitted to the people for their approval, but upon the idea that they will be affected by it in their individual capacity; that their lands or property, if an additional tax is laid, will have to bear it; and hence, that it is right and proper to ascertain their wishes. If it be unconstitutional to submit a law to the vote of the people in any case, can it make any difference in sound sense or constitutional principle, that the submission is made to the people residing in a corporation or that it is made to the people who reside in a district not incorporated? The fallacy of such a position may be shown by this simple statement: If the legislature lay off a district composed of several counties, or parts of counties, and lay a tax on the people of the district for local purposes, but make its collection contingent upon the vote of the people of a district, this law, say opposing counsel, is void, because it delegates legislative power to the people of a district. But, say counsel, if the district is a corporation, and the people of it corporators, then the law would be valid. Now, as the legislature has unlimited power to create corporations, all that is necessary to be done, in order to evade the constitutional barrier, so imposingly created by the opposite side, is for the legislature, whenever they wish to make a law dependent upon the vote of the people of a district, to incorporate that district, and then submit the approval of the law to them. Certainly, an argument which leads to such absurdities is not sound.

But in many of the cases cited, the people of the district or township who were to decide upon the effect of the law were not corporators. In the case in 13 Grattan, the question was submitted to the people of school districts. The people of these school districts were not corporators, nor were the school districts corporations or quasi corporations. Revised Code of Virginia, 371. The case itself also shows this.

So in the case in 8 Barr, 395. The vote of the people of two townships constitute a contingency of the law taking effect. These townships were not made corporations, nor quasi corporations, by the law of Pennsylvania. The case in 8 Barr shows this. But if

they were, the vote was not left to the people of each township, but to the joint vote of the two townships, which demonstrates that it was not left to them to vote as corporators; for if it had been, the vote in one township could not affect the vote of the other. It was left to them as the people of the district composing the two townships.

So in *State* v. *Scott*, 17 Missouri, the question was left to the joint vote of two counties, and both counties were bound. How could this be if it was left to the counties or corporators?

So in 26 Vermont Rep. 357, there is no pretence that the people were a local corporation; that law was left to all the people. And in many of the cases, even where there was a corporation, the vote was not left to the corporators but to tax-payers, &c., which shows the courts never dreamed of the distinction taken by counsel.

Again, a county is not a corporation, nor is a town, unless incorporated by the legislature. Boards of police, supervisors, commissioners, &c., are generally made corporations to manage the affairs of the county as a civil or political district. This don't make the county a corporation or a quasi corporation. 8 John. Rep. 385; 9 John. Rep. 74; *Anderson* v. *State*, 23 Miss. Rep. See Hutchinson's Code, 708–9, to show our counties are merely civil and political divisions, not corporations.

In many of the above cases, the vote was left to the people of the county. Such was the cases cited by us in 13 Monroe's Rep.; 5 Gilman's Rep.; 2 Gill's Rep.; McCook's Ohio Rep.; 17 Missouri Rep.; 10 Barr's Rep.

And the cases in this court of *Williams* v. *Cammack*, and *Strickland* v. *Central Railroad*, were submissions to the people of the counties.

The true principle, as stated by the various courts themselves, is, that the legislature may pass a local law, for a local purpose, in any county, town, or district defined by themselves, and may make the execution of the law dependent or contingent on the vote of the people of the district or county to be affected by it.

Again, the counsel insist that in all cases where a law was left to the vote of the people, as in the case of Missouri, &c., the legislature could not have forced the law upon them without their assent.

1. In building the pier at Albany, the legislature had the right to authorize it to be done without consent.

2. In fixing county sites, the legislature can act without assent of the people.

3. In changing county sites, legislatures can act without consent of the people.

4. In dividing counties, the legislature can act without consent.

5. In laying off school districts, the legislature can act without consent.

6. In imposing taxes on counties, the legislature can act without consent.

Many other cases might be cited, all of which disprove the argument.

The objection, that the law is invalid because it appropriates money from the treasury to internal improvements, and was not passed by a vote of two-thirds, is so fully disposed of in the opinion of the Hon. J. S. Yerger, in the case of *Crawley* v. *Alcorn*, that we deem it only necessary to refer to that opinion.

So also the objection, that the provisions of the third section of the act are unequal and oppressive, is fully met and answered in that opinion, to which we refer the court upon these points as well as upon the main question.

SMITH, C. J., delivered the opinion of the court.

These were bills filed in the Chancery Court for Yazoo county. The first to restrain the collection of the levee tax assessed under the first section of chapter 1 of the Act of December, 1858, p. 33; the second to enjoin the sheriff from paying over to the treasurer of the board of levee commissioners the tax collected under the same act, and to recover it back. The ground for relief in both cases is the alleged invalidity of the law.

The bills charge that the said act is unconstitutional and void, because it provided that the question, whether the tax should be levied and collected, should be submitted to the legal voters of the district; because it is an attempt to appropriate money out of the public treasury to works of internal improvement, and was not passed by the majority required by the Constitution to give effect to such laws; and because, by the third section of the act, the taxes

collected for the three first years from one portion of the district are alone appropriated to the construction of the levee provided for in the act, whilst those to be collected from the other portion of the district, for the same purpose, are appropriated to the discharge of contracts made for the erection of levees under the previously existing laws : which is alleged to be unjust, and against natural right ; in violation of the principle of equality of taxation established in the Constitution ; and, in effect, the appropriation of the property of the inhabitants of the one portion of the district to the benefit of those of the other, contrary to the Constitution and laws of the land.

A demurrer was filed to the bill of complaint in each case, which was overruled ; and appeals taken to this court.

The act under which these controversies have arisen is the act approved on the second day of December, 1858, entitled "An act to aid in repairing and perfecting the levee of the Mississippi river in the counties of De Soto, Tunica, Coahoma, Bolivar, Washington, and Issaquena." The first section of which declares "that there be and is hereby levied and assessed a uniform tax of ten cents an acre on each and every acre of land in this State lying" within the boundaries of the levee district as therein created, "except lands held by the State in trust or otherwise, and school land now exempt from taxation ; which tax shall be continued for the period of five years, and shall be payable annually, on or before the first day of April in each and every year, from the first of April, 1859, to the first of April, 1863, inclusive ;" &c. " *Provided, however,* that the said tax proposed to be levied and collected in the said counties of De Soto, &c.," "shall first be submitted to the legal voters in the district of country proposed to be taxed, on the first Monday in January, 1859, which said election shall be conducted in the same manner, and upon the same notice as other elections, and if a majority of the legal voters, residing in the district of country proposed to be taxed, vote against the said tax, then the same shall not be levied or collected." By the thirty-first section of the act, it is declared "that all acts and parts of acts coming within the purview and meaning of this act, be and the same are hereby repealed, and this act shall take effect and be in force from and after its passage."

A preceding section of the act, section twenty-nine, provides that

it shall be the duty of the governor of this State, as soon as the "bill is passed and becomes a law, to issue his proclamation to the sheriffs of the counties in which the lands taxed in this act are situated, to hold an election as provided for in the first section of the bill, and the question voted for shall be 'tax or no tax,' and on failure of an election being held in any of said counties, then the votes given in the counties in which elections may be held, shall be taken as the sense of the legal voters of the district embraced in this act, as provided in the said first section."

The act establishes a complete system for the erection of new levees where required, and for repairing and completing the levees already made in the counties designated; it provides for the appointment of certain commissioners by the boards of police in the counties named in the act.   The commissioners thus appointed are to elect a president, secretary, and treasurer; and thus organized, are called the board of levee commissioners.   They are to hold meetings at stated times, and are charged with the duty of administering the funds collected under the provisions of the act, and superintending the construction of the levee, its repairs, &c.; and are vested with the capacity to contract, to sue, and be sued; and have the "power of a body corporate to carry out" the objects intended by the act to be accomplished.   The act provides for the assessment and collection of a tax, in certain named counties in the levee district, over and above the tax provided for in the first section; and directs its appropriation.   And in no part of the act is it declared that the collection of the tax provided for in the first section shall be defeated by a failure from any cause to hold the election.

The questions presented by the records in these cases are not new in this court.   They have been the frequent subjects of judicial investigation in the courts of this confederacy; and the very learned and able examination they have undergone before us, renders the task of decision comparatively a light one.

According to the theory of the government of Mississippi, indeed according to the principles which are universally regarded as fundamental in all the American systems of government, all political power is inherent in the people; and all free government is founded on their authority, and established for their benefit.   And hence, that they have an inalienable and indefeasible right to abolish their

form of government, or to alter it in such manner as they may deem most conducive to their welfare.   Bill of Rights, § 2.

They have, therefore, the undoubted right to delegate as much or as little of this inherent political power as they see proper; and to vest it in such agents or departments of government as they shall choose to designate.   The sovereign power of this State, or the people in their national or sovereign capacity, have ordained a Constitution, and by it have established a government, and clothed it with all the powers which it possesses.   It is, therefore, to the Constitution that we must look, for the manner in which they are to be exercised, as well as for the nature and extent of its delegated powers.   And hence, in all cases in which the acts of any department of government are brought in question, it must be shown that those acts are authorized by it, or they will be void.

The legislative, judicial, and executive powers of the government of this State are vested in separate and distinct departments.   And each department is prohibited from the exercise of powers pertaining to the others.   The legislative power of the State is vested in two distinct departments: the one styled "the Senate," the other "the House of Representatives;" and both together, "the legislature of the State of Mississippi."   Con. Art. 2, § 4.   The grant to this department is in general terms.   It vests it with the whole of the legislative power of the State.   No attempt is made in the Constitution to define the term "legislative power;" and, unlike the Constitution of the United States, it makes no attempt at a specific enumeration of the items of legislative power.

In determining, therefore, in a given case upon the legitimacy of the exercise of power by this department, we must consider whether it be in its nature legislative; and if found to be legislative in its character, it must be held to have passed under the general grant of legislative power, unless in some other part of the Constitution is found a prohibition or limitation express, upon the exercise of the power, or one clearly and plainly implied.   And if, upon looking at all the provisions of that instrument, no such prohibition or limitation is there found, none exists.   But as the powers of the legislature are delegated powers, it is not to be doubted, that any act passed by it, which does not fall fairly within the meaning and scope of legislative power, is as clearly void as if it were expressly pro-

hibited.   And manifest reasons exist, which render it quite as imperative upon the courts to refuse their sanction to such an act, as to one which violates an express provision of the Constitution. This species of violation is quite as much to be dreaded, and guarded against, as a direct attack upon any principle expressly recognized as a part of the fundamental law; for, as it has been very justly said, "Attempts of the latter description to violate the Constitution will, generally, be met by instant reprobation, while the stealthy and frequently seductive character of the former is apt to escape detection, until the innovation is made manifest by the infliction of some startling wrong."

The legislative power, to whatever subjects it may be applied, and whatever may be its extent, is vested exclusively in the Senate and House of Representatives, by the people, in whom it resides. They have, by the highest and most solemn of compacts, the Constitution, voluntarily relinquished their right to exercise it.   It can only be reclaimed by an abolition, or an amendment of the Constitution, and the people are the only power competent to do either. To allow the legislature to associate with them in the exercise of the legislative function another tribunal, or to cast back upon the people their delegated powers, would be tantamount to a subversion of the Constitution, by changing the distribution of the powers of the government, without the consent of the authority by which it was ordained.   The proposition, that the legislature can surrender any portion of the authority with which it is vested, or authorize its exercise by any other body, or by the whole people of the State, is alike repugnant to the spirit and positive provisions of the Constitution.   It is opposed to the express provisions of the Constitution, for the delegation of the legislative power to the Senate and House of Representatives, is declared to be exclusive of the other departments, and is necessarily exclusive of every other person or body.   It is opposed to the spirit of the Constitution, which is intended for the equal protection of every party to the social compact, who is entitled to demand under its auspices, "that his rights shall be protected, and that his civil conduct shall only be regulated by the associated wisdom, intelligence, and integrity of the whole representation of the State."   And the inability of the legislature to delegate its powers, independent of these considerations, would arise from the principles which apply to every

delegation of power requiring rectitude, discretion, and knowledge. Indeed, the proposition that the legislative power is incapable of being delegated by the department in which it has been deposited, either to the whole people or to any portion of them, is not denied by any one, and seems so clear that these observations might well have been dispensed with.

Assuming then, as a proposition not to be disputed, that the legislative authority cannot be returned to the people, nor delegated to any other power; and that no act can be binding as a law, unless it has received its final sanction from the legislative will, we come to consider of the grounds upon which it is alleged that the act in question is invalid.

And, first, it is insisted that the act was not, in fact, passed by the legislature, but was a mere project, submitted to the electors of the levee district, whose force and effect, as a law, was made to depend upon a majority of their votes.

The same objection has been frequently made to the validity of acts assumed, in the argument at bar, to be identical with the act under consideration. The cases in which this objection was made, and which are strongly relied on as showing the invalidity of the act, are the cases of *Rice* v. *Foster*, 4 Harr. 479, decided in 1847, by the Court of Appeals of Delaware; the case of *Parker* v. *The Commonwealth*, 6 Barr, 507, by the Supreme Court of Pennsylvania, some months afterwards; the case of *Barto* v. *Himrod*, 4 Selden, 486, by the Court of Appeals of New York, delivered in 1853; and the case of *Maize* v. *The State of Indiana*, 4 Ind. Rep. 342.

The facts in the cases from Delaware and Pennsylvania are, substantially, the same. The existing law of each of these States, provided for granting licenses for the retail of spirituous liquors. The acts which were held invalid in those cases, were submitted to the voters of each township, to decide whether licenses should be continued to be granted in such township; and if decided against, the sale was made criminal. This, in effect, submitted the question, whether the existing laws should be repealed, and a criminal prohibition take their place. The right to repeal a law is as much legislative authority as the power to enact the law in the first place. Hence no argument is required to show that the one is as incapable

of delegation as the other. The voters, in these cases, were not authorized to determine upon the execution of a law in conformity to its provisions, but were vested with the power to decide whether the law should continue to exist. This was, clearly, the view taken in these cases; and while we concur in the correctness of the decisions, after a careful examination, we think, for reasons which we will hereafter state, that those cases are distinguishable from the case at bar.

In *Barto* v. *Himrod,* the question was upon the constitutionality of an act of the legislature of New York, in regard to free schools, which was submitted to a vote of the people of the whole State. The terms of the submission were as follow: By the tenth section, it was provided, that " the electors shall determine by ballot, at the annual election, to be held in November next, whether this act shall or not become a law;" and by the fourteenth section, " that in case a majority of all the votes of the State shall be cast against the law, then this act shall become null and void; and in case a majority of all the votes of the State shall be cast for the new school law, then this act shall become a law, and shall take effect."

This act was held to be unconstitutional and void, upon the ground that it did not, on its face, purport to be a law as it came from the hands of the legislature, for any other purpose than to submit to the whole people of the State the question, whether its provisions, in relation to free schools, " should or should not become a law?" That it was a plan or project prepared by the legislature, " to be submitted to the people, to be passed or rejected." And hence did not derive its sanction from the legislative will; but depended upon the popular vote for its force and effect as a law.

This case was clearly within the principle laid down in *Rice* v. *Foster,* and *Parker* v. *The Commonwealth.* We have no doubt as to the propriety of the decision; but we do not think that it is in anywise applicable to the act under consideration.

These cases, as we understand them, and as they have since been interpreted, especially by the courts in Pennsylvania and New York, do not hold the doctrine, that where the act is complete in itself, and goes into effect as a law, though the execution of some of its provisions may depend upon the popular vote of a district or county, is void upon the ground that there has been a delegation of the

legislative power to the people of the district or county who are thereby authorized to vote; but that they simply lay down the principle, that an act which is a mere legislative preparation, plan, or project of a law, submitted to the people for their adoption or rejection, is void on that ground. *People* v. *Quarter Sessions*, 8 Barr, 395; *Commonwealth* v. *Painter*, 10 Ib. 214; *Bank of Rome* v. *The Village of Rome*, 4 Smith Rep. 38; *Corning* v. *Green*, 23 Barb. 35; *Clark* v. *The City of Rochester*, 24 Ib. 447.

It is settled in this court, and too well settled by authority elsewhere to be controverted, that the legislature has the authority for local purposes to impose local taxation, and that the district or extent of country in which, in any case, such taxation may be imposed, may be determined by the legislature; and further, that it may create a district for that purpose; or that it may impose the taxation over parts of territory without the instrumentality of such district.

There is therefore no objection to the act, for the reason, that the district subjected to the taxation is not one of the subdivisions of the territory of Mississippi recognized by the Constitution or laws. The legislature had the right to pass the act, whether the persons to be affected were or were not citizens of the same county, members of the same corporation, or residents of the same political division or district, previously established by the Constitution or the law. *Williams* v. *Cammack*, 27 Miss. Rep. 209 (and cases cited).

Was then the act in question an expression of the legislative will, agreeably to the forms of the Constitution? Did it receive its final sanction from that will, or did it, so far as the tax is concerned, claim its force and efficacy as a law from the votes of the electors of the levee district?

In most of the provisions of the act it was mandatory. The assessment of the tax was positive and unconditional, and ample provision was made for its collection. The act made provision for the appointment of officers charged with the administration of the fund arising from the tax, and prescribed the manner in which that fund was to be applied; and by express provision, the act went into force from the date of its passage. It had all the attributes of a law. The act was complete, decisive, and final when it left the

hands of the legislature.   The power to enact a law, of necessity includes the right to determine the conditions upon which, in a given case, the law is to come into operation.   Hence, when there has been no attempt to surrender the legislative function, or to associate another power in the enactment of a law, it would, at the least, be absurd to hold that an act was invalid, for the reason, that its operation was to be defeated or suspended by the happening of the prescribed contingency.   The right conferred upon the electors of the district, to determine that one of its provisions should not be carried into effect, was as clearly ascertained, and as much fixed by the will of the lawmaking power, as any provision contained in the act.   It seems, hence, too clear for controversy, that the act did not delegate to the electors the right to pass, or even approve it. On the contrary, the vote of a majority against the collection of the tax can only be regarded in the nature of a condition subsequent, which might defeat, but which was never intended to confer upon the act validity, as an expression of the legislative will.   It was the act itself which made the vote, and prescribed the consequences to result from it.

The proviso to the first section seems to have been misunderstood, as it was in the argument assumed that the vote of the majority of the electors was essential, to give effect to the provision assessing the tax.   It appears to us that the clear and manifest meaning of the proviso is exactly the reverse.   A majority of the electors might defeat the collection of the tax, and thus render the act, as to one of its provisions, inoperative ; but upon no principle of sound logic can it be held, that the majority vote was intended to give validity, as a law, to the provisions by which the tax was assessed. It was designed to prevent the execution of a law, which by express declaration had previously gone into operation.   The act contains no provision, that if no election should be held, that it should, in respect to the tax, be defeated.   It follows, therefore, with absolute certainty, that it would have remained valid and operative, as a law, if there had been no election held, or no vote given.

The act before us, in this respect, is not materially different from the act providing for the erection and repair of levees in Issaquena county.   That act provided for the assessment and collection of a tax upon lands lying within a certain part of that county.   By

the twelfth section, it was declared, " that if a majority of the legal voters who are landholders or householders in said county, shall enter a written protest against the provisions of this act before the board of police, at their first meeting after the 4th of July next, setting forth their objections to said act, then this act shall be void, and of no force," &c.    This act was to take effect and be in force from and after its passage.

In the case of *Williams* v. *Cammack,* above cited, a case arising under that law, it was objected that it was invalid ; because, by the section above quoted, its effect and operation depended upon a majority of the voters of the county as to whether it should become a law or not.    But it was held, Justice Handy delivering the opinion of this court, that "the act in its terms possessed every quality of a complete and operative legislative act.    Nothing was required to be done by the people to give it force and effect.    Being thus complete and effective, the twelfth section provided that if a majority of the legal voters, who were householders or landholders of the county, should enter a written protest against its provisions before the board of police at their first meeting after the 4th of July, the act should become void, and of no binding force.    This protest certainly gave no force to the act, but was intended expressly to put an end to its operation.    If the provision had been that the act should not have any effect until a majority of the voters should sign their written assent to it, the objection would have more force.    But no such condition was annexed to it.    Being a local act affecting only the property holders of the particular county and intended for their benefit, it was provided that they should have the privilege of putting an end to its operation in the manner prescribed by the act, otherwise that it should continue.    It derived no legislative force from the action of the voters, but quite the reverse."

After a careful review, we are well assured of the correctness of the decision in that case.    It is not only entirely defensible on principle, but it is sustained by a very great preponderance of authority.    Every court of this confederacy (with a single exception), entitled to consideration, which have adjudicated upon the validity of legislative acts similarly conditioned, has recognized the correctness of the doctrine laid down in *Williams* v. *Cammack.*    In the cases of *Rice* v. *Foster,* and *Parker* v. *The Commonwealth,* in

which acts, assumed to be similar to the act under consideration, were held invalid, the reasoning employed to demonstrate their unconstitutionality is a clear vindication of the correctness of the principle held in *Williams* v. *Cammack.*

But the courts have gone farther, and with great unanimity have held that where the act is complete in itself, and goes into effect as a law, not depending upon the vote of a district or county, or the members of a corporation, whether it shall be enacted as a law, there has been no delegation of legislative power, but that it is a valid legislative act, although its provisions, or what it commands to be done, may be made to depend upon the contingency of a vote of such district, county, or corporation. As in Pennsylvania, *The People* v. *Quarter Sessions,* 8 Barr, 395 ; *Commonwealth* v. *Painter,* 10 Ib. 214. In New York, *Corning* v. *Green,* 23 Barb. 35; *Clark* v. *The City of Rochester,* 24 Ib. 447 ; *Bank of Rome* v. *The Village of Rome,* 18 New York Rep. 38. In Delaware, *Stewart* v. *Jefferson,* 3 Harr. 335. In Vermont, *State* v. *Parker,* 26 Vermont Rep. 357. In Illinois, *The People* v. *Reynolds,* 5 Gilman, 1. In Kentucky, *Slack* v. *Maysville and Lexington Railroad,* 13 B. Monroe. In Ohio, *The Cincinnati, Zanesville, and Wilmington Railroad* v. *The Commissioners of Clinton County,* 1 Ohio State Reps. 77. In Maryland, *Burgess* v. *Pue,* 11 Gill. Rep. In Alabama, *Stein* v. *The Mayor and Aldermen of Mobile,* 24 Ala. Rep. 591. In Virginia, *Bull et al.* v. *Read et al.,* 13 Grattan, 78; and also in *Strickland* v. *The Mississippi Central Railroad* (not reported), decided by this court in 1853.

In *Parker* v. *The State* (above-cited), the question was upon a license law of 1852, in which it was provided that it should come into force on the second Tuesday of March, 1853, with a proviso " that meetings of the freemen of the State should be holden on the second Tuesday of February, 1853, to vote their judgment and choice in regard to the act;" and if a majority should vote "no," " then the act should take effect in December, 1853." The object of the proviso was, in the event of a negative vote, to suspend the act until the succeeding meeting of the legislature.

The opinion was delivered by a learned judge and able lawyer, who said : " In this State, the Constitution vests the legislative power in the General Assembly, consisting of the House of Repre-

sentatives and the Senate; and if the mode of proceeding, under consideration, is equivalent to giving legislative power to the people at large, it is, no doubt, in conflict with the Constitution. But it is not very obvious to us why this should be so regarded, unless it is done as matter of argument, and to justify a foregone conclusion, which is not one of the legal elements of a judicial determination more than it is of a legislative act, that it shall have the sanction of the people. But the law of 1852 did not, even in form, depend upon the vote of the people for its coming into force. The statute in terms was made to come in force just when it did, on the second Tuesday of March, 1853; and if there had been no meetings of the freemen called, or no vote had been taken, the statute would have become a law just when it did. The only thing made contingent and conditional in the statute was, in one single event, the operation of the law should be suspended until after the next session of the legislature. It may be said this difference is not much. I know that very well. But it is as much as that between a condition precedent and subsequent; and this, in the case of an illegal condition, as it is claimed this was, is quite important. In the former case, the contract or act is rendered void; and in the latter, the condition only is avoided, and the contract or act remains in force. And we do not see but upon sound reasoning and good logic the result must be the same in regard to statutes. We think it must and should be. The condition or proviso was only for suspending the operation of the statute; and if the legislature had no right to annex any such condition, then the statute will not be affected by it. It might have been wholly disregarded by the people, and the effect must have been the same. The law would have come in force on the second Tuesday in March. And did the taking a vote (which was in the affirmative, but which if it had been in the negative was, it is claimed, of no force, and should consequently have been disregarded) make the legal state of the enactment any different? We think not. And thus the form of enacting this statute, seems to steer quite clear of the main argument upon which all of the cases have gone, where similar statutes have been held invalid. And in regard to this statute, it cannot, with any show of fairness, be said, that the legislature did not enact the law, and fully pass upon all questions of constitutionality and expediency involved

in the subject.    And it is admitted, on all hands, that the legisla-
ture may enact laws, the operation or suspension of which may be
made to depend upon a contingency.   This could not be questioned
with any show of reason or sound logic." . . . . " If the operation
of a law may be fairly made to depend upon a future contingency,
then, in my apprehension, it makes no essential difference what is
the nature of the contingency, so it be an equal and a fair one, a
moral and legal one, not opposed to sound policy, and so far con-
nected with the object and purpose of the statute as not to be a
mere idle and arbitrary one." . . . . " It seems to me that the
distinction attempted between the contingency of a popular vote
and other future uncertainties, is without all just foundation in sound
policy and sound reasoning, and that it has too often been made
more from necessity than choice.    More to escape from an over-
whelming analogy than from any difference of principle in the two
classes of cases."

And in the case of *Bull et al* v. *Reid et al.,* decided by the Court
of Appeals of Virginia,—also cited above,—the question arose,
under a statute of that State, which provided, that that portion of
Accomac county, known as the first magisterial district, be esta-
blished as a district distinct from the rest of the county for a free
school.    And the County Court was required to order a vote to be
taken in the district " for or against the establishment of a separate
free school system in said district."    If three-fifths of the voters
were in favor of it, then it was to be established, and commissioners
appointed, who were vested with certain powers, amongst which
was the power of taxation.    This act was assailed on two grounds:
1. Because the legislature was incompetent to make the operation
of a statute dependent upon the result of a popular vote of the
district; and 2. Because it had no authority, under the Constitu-
tion, to delegate the power of taxation to the board of commissioners
created by the act.

These objections were overruled, and the act held valid.    The
court, after commenting on the power of the legislature to pass
conditional laws, or to make their operation dependent upon some
future contingency, declares, that " it must be for them to judge
in what contingency, or upon what condition the act shall take
effect.    They *must* have power to prescribe any they may think

proper; and if the condition be, that a vote of approval shall be first given by the people affected by the proposed measure, it is difficult to see why it may not be as good and valid as any other condition whatever. There can be no inherent vice in the nature of such a condition which shall serve to defeat the act, when it would be legal and effectual if made to depend upon some other condition. To say, in such a case, that the act is made by the voters, and not by the legislature, is to disregard all proper distinctions, and involves an utter confusion of ideas on the subject." . . . "But there is a plain distinction between the act to be done by the voters and the legislative function. They have no power to alter or amend the act, or to substitute something else in its place. When it passed the Assembly, with the forms and in the manner prescribed by the Constitution, the legislative function was exhausted; although by its terms it required a vote of approval by the people interested, before it went into operation. But when that vote was given, and the result ascertained, in the mode prescribed, the act became as operative and effective as if it had simply fixed upon that day for its commencement."

These two cases serve to indicate the general course of reasoning employed, and state the conclusions at which the judicial mind of this country has arrived on this subject. We are, however, not to be understood as, unqualifiedly, approving all the reasoning of the courts, in reference to the subject, or as sustaining all the conclusions which that reasoning tends to establish. In these cases, as in all the cases which we have cited above, or have examined, the authority of the legislature to make the operation of an act dependent upon the vote of the electors of a district or county, or upon that of the members of a corporation, is based exclusively upon the grant of legislative power in the Constitution. And it would seem to be a proposition too clear for argument, that if the legislature have the right to enact a statute, and make it depend for coming into force upon the vote of a district, or a portion of the people, that the power is not derived, from the fact that the persons who are to vote upon the proposition, are associated together as members of the same municipal body, or as inhabitants of some legal or constitutional subdivision of the territory. For in all cases of a corporation, or quasi corporation, the rights, privileges, and

powers of the corporators, or the body appointed to act for it, are conferred in the act creating such corporation. And no one will maintain that, by the passage of an act creating a corporation, the legislative power has been enlarged so as to authorize it to delegate an authority to such corporation, which it was incompetent to confer in the first instance. If the legislature possess the authority at all, it must of necessity derive it from the Constitution, the source whence proceed all of the powers of government.

It is next assumed that the statute under consideration is, in effect, an act appropriating money from the treasury for works of internal improvement; and that, as it was not passed in conformity with the directions of Article 7, Section 8, of the Constitution, which declares that " no money from the treasury shall be appropriated to objects of internal improvement, unless a bill for that purpose be approved by two-thirds of both branches of the legislature; and a regular statement and account of the receipts and expenditures of public moneys shall be published annually." And hence it is insisted that it is invalid.

A general revenue law, or a law imposing taxation upon the whole people, may be passed by a simple majority vote of the two houses; and a law appropriating money from the treasury for general purposes may be passed by the same vote. The reason is obvious. The whole people are interested in the support and maintenance of government, and the employment and appropriation of the public funds. Hence the authority to impose taxes, and to disburse the public revenue for general purposes may, with safety, be intrusted to a majority of the popular representation. Not so with regard to the appropriation of money for works of internal improvements, in which, of necessity, the whole of the people can never, in any given case, be equally interested. Ordinary prudence and foresight, therefore, suggested the provisions of the 8th section. The framers of the Constitution knew that applications would be made to the legislature, and that sinister influences might be brought to bear, which would induce a majority of its members to consent to appropriations of the money contributed by the whole people to objects of a purely local character, in which only a small minority of any of the municipal subdivisions of the State were interested, unless restrained by some imperative provision. The same reasons are

applicable, it is true, when the provisions of that section are considered in reference to the appropriation of money raised by local taxation, for the benefit of those who pay the tax. But it is manifest that they apply with such slight force, that we think it cannot with fairness be asserted, that those provisions were intended to govern the enactment of statutes imposing local taxation, and applying the money for the benefit of the inhabitants of the locality by whom it is contributed.

And further, we think that the last clause of the eighth section, which declares that " a regular *statement* and *account* of the receipts and expenditures of public moneys shall be published annually," shows conclusively that the treasuries of the different counties, of districts, and of corporations, by which taxes collected for local purposes must be disbursed, were not present to the minds of the convention; and hence, that the section was intended to apply exclusively to the public money of the State, which by law is to be deposited in and disbursed from the State treasury located at the seat of government.

From these considerations, it results that the act is not invalid, for the reason assigned.

The third and last objection applies specially to the third section of the act, which provides that the taxes collected, for a definite period, from that part of the levee district not embraced by the boundaries of the counties situated immediately upon the Mississippi river, is alone to be applied to the construction, &c., of the levee; whilst the taxes to be collected from those counties for the same period are applied to the payment of debts incurred, and to the discharge of contracts made, under the previously existing levee system. These provisions are alleged to operate unequally and unjustly as to that part of the district not contained in the river counties; and, in effect, to be an appropriation of the property of the inhabitants of that part for the benefit of those who reside in the counties of the district immediately bordering upon the river.

If the provisions of the section objected to are a constitutional expression of the legislative will, we have nothing to do with the alleged inequality and injustice in the distribution and appropriation of the tax assessed and collected under its directions. The complaint may or may not be well founded in fact. The presumption,

Alcorn *v.* Hamer.   Same *v.* Hill.

however, is, that it is not.  The theory of the law, and it is the
only foundation on which its equity can stand, is, that the inhabi-
tants of the levee district, as created and defined by the act, would
be generally and equally benefited by the erection, &c., of the pro-
posed levee upon the bank of the Mississippi river.  We judicially
know that laws for the leveeing the Mississippi were, for some years,
in operation before the enactment of the statute under consideration.
Hence if, under the previous laws, taxes were imposed and collected,
contracts entered into, and work done in the construction of the
levee, it may be supposed that the inhabitants of that section of
the district, in whose behalf the complaint is now urged, were as
much benefited thereby as those of the counties in the district bor-
dering on the river.  If such be the fact, for aught we can perceive,
the provisions of the third section may be perfectly equal and just.

However this may be, as the act was simply an exercise of the
taxing power, and not an attempt, under the right of eminent
domain, to take private property for public use, if it were conceded
that the provisions of the third section operated unequally upon
the different portions of the district, the courts for that reason
would not be authorized to declare them void.  It is perfectly well
settled that, where any particular county or district is to be bene-
fited by a public improvement, the inhabitants of such county or
district may be taxed for the whole expense of the improvement,
in proportion to the supposed benefit received by each ; and that in
this respect no limitation has been placed upon the taxing power
vested in the legislature.  *Williams* v. *Cammack*, and the cases
cited in the opinion.